# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
July 10, 2012 Session

## CHARLES RICE v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Shelby County
### No. 0100035     Chris Craft, Judge

---

### No. W2011-01069-CCA-R3-PD  - Filed March 27, 2013

---

The Petitioner, Charles Rice, appeals from the judgment of the Shelby County Criminal Court denying his petition for post-conviction relief.  A Shelby County jury convicted the Petitioner of premeditated first degree murder and felony murder and imposed a sentence of death.  The Tennessee Supreme Court affirmed the Petitioner's convictions and sentence on direct appeal.  See State v. Rice, 184 S.W.3d 646 (Tenn. 2006).  On appeal, the Petitioner challenges the effectiveness of his counsel's representation in both the guilt and penalty phases of the trial.  We hold that the post-conviction court properly found that the Petitioner received effective assistance of counsel at trial.  The judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed**

CAMILLE R. MCMULLEN J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Donald E. Dawson, Paul Johnston Morrow, and Kertyssa Smalls, Nashville, Tennessee, for the Petitioner-Appellant, Charles Rice.

Robert E. Cooper, Jr., Attorney General & Reporter; James E. Gaylord, Assistant Attorney General; Amy P. Weirich, District Attorney General; and John W. Campbell, Deputy District Attorney General, for the Appellee, State of Tennessee.

## OPINION

A Shelby County jury convicted the Petitioner, Charles Rice, of first degree premeditated murder and felony murder of his thirteen-year-old step-daughter during the perpetration of a rape.  Following a sentencing hearing, the jury found the following

aggravating circumstances: (1) the Petitioner had previously been convicted of a violent felony; (2) the murder was especially heinous, atrocious, or cruel; and (3) the murder was committed during the perpetration of a rape. See T.C.A. § 39-13-204(i)(2), (5), (7) (1997). The jury also found that evidence of these aggravating circumstances outweighed evidence of the mitigating circumstances beyond a reasonable doubt and imposed a sentence of death. On direct appeal, the Tennessee Supreme Court held the jury improperly relied upon the prior violent felony aggravating circumstance in section 39-13-204(i)(2) but otherwise affirmed the Petitioner's convictions and sentence. See State v. Rice, 184 S.W.3d 646 (Tenn. 2006).

The Petitioner filed a pro se petition for post-conviction relief. The post-conviction court appointed counsel, who filed an amended petition. Following an evidentiary hearing, the post-conviction court entered an order denying relief. The Petitioner filed a timely notice of appeal.

## TRIAL PROCEEDINGS

The Tennessee Supreme Court summarized the evidence presented at trial as follows:

The victim . . . was reported missing on June 18, 2000, and her body was discovered on June 25, 2000. After a police investigation, the [petitioner], Charles Rice, was questioned and arrested for her murder. . . .

The State's proof at trial established that on June 18, 2000, the victim was staying with her father, Steven Dwayne Branch ("Branch"). Branch lived in Memphis with his girlfriend and her three children. The victim usually lived with Branch's sister, Margaret Branch, but she was staying with her father because it was Father's Day.

The victim's mother, Tracie Anderson ("Anderson"), was married to the [petitioner] during the time relevant to this case, but the victim never lived with her mother and the [petitioner] while they were married. Anderson and the [petitioner] had argued on June 6, 2000, prompting Anderson to leave the [petitioner] and move in with her brother. She had left the [petitioner] on numerous other occasions, but had always returned. Prior to her leaving, the [petitioner] told her that if she left him, "it will hurt you more than it hurts me." Anderson told Branch not to let the victim go to the [petitioner]'s house anymore. According to Anderson, the [petitioner] used drugs, specifically crack cocaine.

On the morning of the 18th, the victim left her father's house at about

-2-

11:00 a.m. with three other girls. She was wearing "a white short-pants overall set with a navy blue shirt, some white socks, her blue and white tennies, and she had a necklace around her neck." Monica Downey ("Downey"), one of the daughters of Branch's girlfriend, was with the victim that day. She testified that she, the victim, and five other girls "walked around because that's our normal routine every day." While out walking, the [petitioner] came by and talked to the victim. Downey said that she could not hear what was said.

After the [petitioner] left, the girls went to a store and then to the [petitioner]'s house on Firestone Street. The victim went inside the house while Downey and the other girls waited outside. The victim later came outside and told Downey that they all had to leave; they left the victim on the [petitioner]'s front porch and went to a park. According to Downey, this was about 4:00 or 5:00 in the afternoon. Downey said that it was not unusual for the victim to go to the [petitioner]'s house when the victim's mother lived there. Downey did not know that the victim's mother no longer lived there. She said that she never saw the [petitioner] while they were at his house.

According to Willie Lee Hall ("Hall"), the [petitioner]'s stepfather who lived with the [petitioner] at 1272 Firestone Street, the victim came by the residence on the 18th of June, asking to walk the dog. After Hall refused, the victim went outside to talk to the girls with whom she had been. Then the victim left the house with the [petitioner], walking down the street toward Bellevue Street. According to Hall, this was about 3:40 in the afternoon. Later that afternoon, the [petitioner] returned to the house to watch television; he did not change his clothes. Hall said that while at the house, before leaving with the [petitioner], the victim was never out of his sight.

Marquette Houston ("Houston"), a friend of the victim from the neighborhood, saw the victim on the afternoon of June 18, sitting on her father's front porch listening to music. He recalled that she was listening to a Vanilla Ice CD. He told her that "nobody . . . listens to Vanilla Ice [any] more." Houston noticed that the CD had a scratch on it.

Tony Evans ("Evans"), a friend of the victim's mother and father, also saw the victim on the day of her disappearance. He lived on Firestone Street, and on the afternoon of June 18, around 2:00 or 3:00 p.m., he saw the victim and a "lot of little girls" walk to the [petitioner]'s house. Later that day, he observed the victim and the [petitioner] walking away from the [petitioner]'s house heading west on Firestone. He found it surprising that the two were

-3-

together because he knew that the victim's mother had recently left the [petitioner] due to abuse. Therefore, he followed the victim and the [petitioner]. After turning off Firestone Street, the two went up a small street then headed back on Empire Street, and then south on Bellevue toward an Amoco station. Then they walked past the station through the pathway on the side. At that time, Evans returned home to finish his yard work. Evans explained that he stopped following the two when they got to the path by the Amoco station because the path leads to Brown Street, where some of the [petitioner]'s relatives lived. He assumed that the victim's mother and the [petitioner] had gotten back together and that the [petitioner] and victim were going to visit relatives.

The victim's father began to worry when the victim had not returned home by 5:00 p.m. on June 18. He called the police that night to report her missing. The police told him that she would probably be back and that they would report her as a runaway. Branch testified that the victim had never run away before, so that night he began to search the neighborhood for her. A few of his neighbors helped in his search.

The following day, Anderson called Evans and asked him if he had seen the victim. Evans told her that he had seen the victim and the [petitioner] go down the path next to the Amoco station. After speaking with the victim's mother, Evans went to the area of the path to look for the victim, but did not find anything. He explained that he wanted to find the victim because both parents were his good friends. Several days later, Branch also spoke with Evans, telling him that the victim had been missing since June 18.

Evans testified that two days after the victim was last seen, he saw Mario Rice ("Mario"), who is the [petitioner]'s nephew, and the [petitioner] walk together down to the woods by the Amoco station. He said that the police were called, but they did not get there in time because it was night. During the week the victim was missing, Evans saw the [petitioner] and Mario sitting in the yard of a house on Alaska Street, watching that same pathway. This made him even more suspicious of the [petitioner]. For two to three nights in a row, Evans hid in the crawl space underneath the house on Alaska Street where Mario and the [petitioner] were. While there, he overheard Mario and the [petitioner] discuss plans to kill Anderson. He never heard them talk about the victim. He remained under the house on those nights until 4:00 or 5:00 in the morning.

-4-

On June 25, Evans had repaired his four-wheeler and drove back to the area surrounding the pathway to search again. When he went into the woods, he smelled an odor like something had died, so he began looking in the direction from which the smell was coming. He had to chop through the bushes with a machete. Finally, he "stepped up on the tree and looked down, [and] saw her shoes." Evans ran from the woods to Branch's house and told him that he had found the victim's body behind the Amoco station on Chelsea Street.

Branch, Evans, and Houston went in Branch's truck to the parking lot of the Amoco station. From there, Evans led them down a trail behind the station. On the path, Houston noticed a Vanilla Ice CD on the ground that had the same scratch on it that he had seen on the CD of the victim, and it looked like it was "cracked or something." They reached the victim's body, which was lying in a ditch in a heavily wooded area. When they found the victim, her shorts and underwear were down around her ankles. Branch testified that he could not recognize his daughter's facial features because the body had decomposed, but he recognized her clothing, shoes, and necklace as the same as she had been wearing on the day she disappeared. Evans was also able to recognize the victim by her hair and clothes. After identifying the body as that of the victim, they called the police.

Sergeant Robin Hulley of the Memphis Police Department was called to the Amoco station on Chelsea Street at approximately 5:00 p.m. on June 25, 2000, on a "DOA unknown." Once she arrived at that address, she was led by a uniformed officer to the actual scene behind the store. Sergeant Hulley testified that to the right side of the store there is a pathway that opens onto a big grassy field, about the size of a football field. The victim's body was located in what appeared to be a dry creek bed in a heavily wooded area to the right of the opening. The victim was lying face up. She had on a pair of white short overalls, which were pulled completely down to around her ankles, and her underwear was also pulled down. Her shirt was still in place. Sergeant Hulley stated that the body was not visible from the path or the grassy field, although it was not covered by any brush. The only blood found at the scene was directly around the body. While walking down the path, Sergeant Hulley noticed a broken Vanilla Ice CD, which he thought strange due to the fact that there was no other debris on the path.

Sergeant James L. Fitzpatrick of the Memphis Police Department was in charge of the crime scene on June 25, 2000. He testified that the victim's

-5-

body was found in an old ditch, in advanced stages of decomposition. There was no upper torso, the legs and arms were still intact, and the head appeared to be "mummified." The victim had on short pants, which were down around below her knees.

Michael Jeffrey Clark, an officer with the Memphis Police Department, was also assigned to investigate the murder on June 25, 2000. At the scene, Officer Clark spoke briefly with Evans and Houston. He later spoke with them in depth at the homicide office, where he also interviewed Branch, Anderson, and Mario. Officer Clark then went to the [petitioner]'s home and spoke with the [petitioner]'s stepfather, Hall, and the [petitioner]'s mother, Delores Hall. According to Hall's testimony, the [petitioner] told the police that on the day of her disappearance, he and the victim parted ways at the intersection of Bellevue and Firestone.

The [petitioner] was subsequently brought to the police station, where Officer Clark and Officer Ernestine Davison interviewed him at approximately 2:00 a.m. on the morning of June 26. Officer Clark read the [petitioner] his Miranda rights, and the [petitioner] signed a form indicating that he understood those rights. Clark told the [petitioner] that other witnesses had seen him enter the woods with the victim near the Amoco station. The [petitioner] denied going into the woods with her and denied any knowledge of her disappearance.

Clark then told the [petitioner] that it appeared to him that the victim had been raped, and he asked the [petitioner] if he would be willing to submit to a DNA test so that police could compare his DNA with the DNA found on the victim. At that point, the [petitioner] admitted that he had engaged in consensual sex with the victim inside the kitchen of his parents' house on June 18, explaining: "I had sex for about a minute with her." The [petitioner] admitted the victim asked him for money and to walk his dog. He said that he asked her to walk to the store with him so he could get some change, but when they arrived at the store, he told the victim that he did not have any money, and they parted ways.

The [petitioner] then changed his story again, stating that he and the victim went to his house after the victim asked him for money, and this led to the sexual act in the kitchen. The [petitioner] said that the victim then left the house alone and that he did not see her again. When Officer Clark confronted the [petitioner] with Hall's story that he saw the [petitioner] leave the house with the victim, the [petitioner] replied that he entered the woods with the

-6-

victim, but denied any wrongdoing.

Officers Clark and Davison decided to arrest the [petitioner] and to place him in the Shelby County jail. While checking him in, the [petitioner] asked to be placed in protective custody because he had received some threats from family members in the neighborhood. Officer Clark asked the [petitioner]: "Do you mean the family members of the girl you killed?" The [petitioner] responded: "Yes, sir." On cross-examination, however, the officers testified that the [petitioner] constantly maintained that he did not kill the victim.

Sergeant Fitzpatrick read the [petitioner]'s statement to the jury. In his statement, the [petitioner] said that the last time he saw the victim was between 4:30 and 5:30 p.m. on June 18, 2000, behind the Amoco station. When asked how he and the victim came to be behind the Amoco station, the [petitioner] replied, "Me and [the victim] walked down through there on the way to the field. And that's when my nephew [Mario] killed [the victim]." The [petitioner] explained that he and Mario planned to have the victim at that location so that Mario could kill the victim. He said that Mario wanted to kill the victim because Mario "was tired of seeing [the petitioner] go through things [he] was going through with [the victim's] mother." The initial plan was to have Anderson, the victim's mother, accompany the [petitioner] to the field where Mario would kill her, but they could not find Anderson.

The [petitioner] stated that he first encountered the victim on the day of her death as she was walking between Bellevue and Smith Street with her friends. The victim wanted to walk his dog and wanted ten dollars, so the [petitioner] told her to meet him at his stepfather's house on Firestone Street. He said that while they were at the house, they had sex in the kitchen, and "it lasted about sixty seconds." He said that the victim "brushed her chest against [him] and said she knowed [sic] that her stuff was gooder [sic] than her mother's." He said that this was the first time they had sex and that he did not reach climax. After the sexual encounter with the victim, they left the house and went to the Amoco station on Chelsea Street under his guise that he would get change and give the victim the ten dollars that she requested. The [petitioner] then told her that he did not have the money. At that time, the victim followed him into woods, where they were met by Mario. The [petitioner] then said:

And that's when we said, "F**k this b***h; let's kill this

b***h." I told [the victim] about an apple tree and a fenced-in area, so she went in there, and that's when my nephew started to stab her. He stabbed her in the head first and in the throat numerous times and in the chest area numerous times. That's when I ran, and my nephew, Mario Rice, ran behind me. We got out to the street on Brown, and I ran towards Lewis or Louisville. I don't know which one. And Mario went the other way on Brown. I went up Louisville or Lewis to a friend's house on Montgomery. Then I went to another friend's house on Ayers, and that's where Mario and I met up again. We started drinking, and we stayed together until about 10:00 p.m. And then he went home and I went home.

The [petitioner] said that Mario used a "kitchen knife, not a butcher knife." He then provided more details about the actual murder, saying:

She was facing him, and he was facing her, and there were a lot of words. He was talking to her. I really don't know exactly what he was saying. Then he pulled the knife from out of his left back pocket, and then he stabbed her in the head. She went down on one or two knees, and that's when he stabbed her in the throat a bunch of times, and she fell back on her back. She was moving her hands like she was trying to tell Mario to stop. She pulled - and she had pulled her clothes down before the first stabbing, and I guess she thought she was getting ready to be raped by what Mario was saying because it made me wonder why was she taking her clothes down. As I think about it, I think she must of fell back because of the way Mario was stabbing her in the neck and chest.

The [petitioner] said that the plan was to lure the victim's mother to the field and to "take care" of her. He said that he "was going to take care of the mother, and Mario was going to take care of anybody else." He continued, "I was probably going to jump on the mother. That probably wasn't all I would have done to her." About the victim's death, the [petitioner] stated that he felt "sad, guilty, and responsible" because he "could have prevented it by not luring her into that field."

Sergeant Fitzpatrick took the [petitioner] back to the crime scene on June 27 for a "walk through" video of the events leading to the victim's death.

The [petitioner] said he got the victim to accompany him to a secluded part of the field by telling her there was an apple tree back there. The [petitioner] then led the officers directly to the spot where the body had been discovered. On cross-examination, Sergeant Fitzpatrick admitted that in every statement given by the [petitioner], the [petitioner] denied actually killing the victim.

Two or three days after the police first went to Hall's house, they returned and asked to search the house. Hall granted permission. The police took a knife that was on the dining room table. Hall testified that the knife had been lying there for the "longest time."

Dr. Cynthia Gardner, a medical examiner with the Shelby County medical examiner's office, testified that she first examined the victim's body at the crime scene. She said that the body was found "lying on her back in a field" with her shorts pulled down around her ankles. The body was in a state of advanced decomposition, and "in many areas . . . the soft tissues were completely gone and only the skeleton remained." She next performed an external examination of the body with the clothing intact. She noted that decomposition was occurring at different rates in different areas of the body. She explained that "differential decomposition is associated with areas of injuries."

> If there's a breach in the skin surface somewhere or even if there is a large bruise, which is just a collection of blood, both of those factors are very attractive to the infection bacteria that promote decomposition. So when you see a body where there were areas of decomposition which has [sic] occurred at a faster rate, it's more advanced decomposition in a very specific area. That indicates that there was probably injury in that area.

Dr. Garner noted advanced decomposition in the "head, the neck, the chest, the upper back, and in the groin area." She opined that because of the advanced state of decomposition in the vaginal area, there had been some sort of trauma or injury to that area prior to death. The victim had what appeared to be stab wounds in the right lower quadrant of her torso and on the left wrist. Dr. Garner stated that the wounds to the wrist were defensive injuries. All the wounds were consistent with those inflicted by a kitchen knife.

Examination of the victim's shirt revealed multiple tears that were consistent with those produced by a knife. Ten total defects were found in the

shirt: one in the right lower quadrant; four in the anterior left chest; one in the right chest; three in the arm; and one in the back. Dr. Garner observed injury to the victim's neck, indicating that a sharp instrument went all the way through the soft tissue from the skin down to the bone in the back. She explained that the windpipe and esophagus are located directly in this region of the neck and would "most definitely have been severed." There was another point of sharp trauma to the back of the skull where there was a puncture wound, but it did not penetrate through the skull. From her examination, Dr. Garner determined that there were ten stab wounds on the shirt, three to the neck, one to the back of the head, and two to the left wrist, for a total of sixteen stab wounds. She concluded that the cause of death was multiple stab wounds.

Due to the extent of decomposition, Dr. Garner was unable to obtain DNA from the victim's body for testing. The victim's body was identified as that of [the victim] through comparison of dental records.

Dr. Steven Symes, a forensic anthropologist with the Shelby County medical examiner's office, also testified as to the condition of the victim's body. He examined the bones of the victim's upper body and found four instances of "sharp trauma to bone," three of which were in the neck and one in the back of the skull. The wounds in the neck were inflicted from front to back, penetrated through her neck, and impacted her spinal cord. The knife used had been a single-edged blade, like those of some kitchen knives.

In his defense, the [petitioner] called several witnesses who provided alibis for both himself and Mario, in direct contradiction to the [petitioner]'s statement to police that he had lured the victim to the field where Mario proceeded to murder the victim.

Providing an alibi for Mario were Lee Bearden ("Bearden"), R.L. Branch, Donnie Tate ("Tate"), and Larry Rice. According to Bearden, R.L. Branch and Tate, the three men, plus Mario, were watching football and playing dominoes at Bearden's house from 1:00 p.m. until about 3:00 p.m. on June 18, 2000. Mario then left with R.L. Branch and Tate and went to the Save-A-Lot grocery store where they met Larry Rice and Carolyn Rice at about 4:00 p.m. Then they went to Tate's house for dinner. Around 8:00 p.m, R.L. Branch took Mario to meet a girlfriend. R.L. Branch also testified that Mario and the victim were cousins and that they were close.

Roy Herron provided an alibi for the [petitioner]. He testified that at 5:00 p.m. on June 18, 2000, the [petitioner] came to his house, where they watched the U.S. Open golf tournament until its conclusion at about 7:00 p.m. Mr. Herron said that the [petitioner] did not have any blood on his clothes or shoes, and he did not have a weapon on him. Julie Scobey, an employee of WMC-TV in Memphis, confirmed that on June 18, 2000, the U.S. Open golf tournament was broadcast on their station from 12:30 p.m. until 6:59 p.m.

Although he did not testify in his own defense, the [petitioner] sought to discredit the testimony of Evans. To contradict Evans' testimony that he had hid in the crawlspace under the house in which the [petitioner] was visiting, the defense called Michael Patton ("Patton"). Patton testified that in June of 2000, he stayed at 1039 Alaska Street at least once a week, but usually two to three times a week. He testified about the hole that was located behind the house that led to the crawl space. He said that nothing was kept under there except for a ladder. The entrance to the crawl space was located at the back of the house, under the children's bedrooms. According to him, there were dogs in neighboring yards that would bark if anyone was in the backyard. He said that a person inside the house would be able to hear if someone was hiding in the crawl space. Patton was not at that house on either June 23 or 24.

Evans was convicted on October 3, 2001, of possession with intent to sell fifteen grams of crack cocaine and 2.7 grams of powdered cocaine. This was after the arrest of the [petitioner], but before the [petitioner]'s trial. Evans received a six-year sentence. Rosyln Johnson is a presentence investigator for Correctional Alternatives, Inc. She prepared Evans' presentence report when he was convicted. That report indicated that Evans said that he had been diagnosed as being paranoid schizophrenic. He listed his next psychiatric appointment and provided her with medicine bottles. On cross-examination, Evans denied that he had been diagnosed with paranoid schizophrenia and denied that he took medication for any mental illness. When he was shown records that he had given his corrections officer indicating that he was in fact on medication, he denied that the statements in those reports were true.

Finally, Dr. Joseph Angelillo, a clinical psychologist, testified that he had met with the [petitioner] five times and performed a series of tests. The [petitioner] had a full-scale IQ of seventy-nine, placing him in the eighth percentile.

Stephanie Fitch also testified for the defense. She had given a

statement to the police on July 16, 2001, in which she said she saw the victim at the store around 5:00 p.m. with other girls and later saw her walking alone on the railroad tracks. She testified at trial that this prior statement was not true. She also denied signing the statement. She testified at trial that she last saw the victim on the morning of the 18th at the store with a bunch of girls.

After deliberation, the jury convicted the [petitioner] of first degree premeditated murder and of first degree felony murder; these convictions were subsequently merged.

. . . .

During the sentencing phase of the trial, the State put on the following proof. First, Bob Fleming, a criminal court clerk, testified that the [petitioner] pled guilty to aggravated assault on January 2, 1991.

Steven Branch testified that the victim was thirteen years old when she disappeared. She had been living with his sister, but staying with him for the summer. She wanted to be a model when she grew up, and he was saving money to send her to modeling school. He enjoyed spending time with her, and since her death, he felt "real bad." He often spends nights sitting in his living room looking at her picture.

The [petitioner] called Gloria Shettles, a mitigation investigator, to testify about the [petitioner]'s past. One of the [petitioner]'s sisters died from lupus; another sister died from colon cancer. A brother died in a drowning accident, and his father died from cancer.

The [petitioner] attended school in Memphis. He was held back in the third grade. In the fifth grade, he was only reading at a third-grade level and failed spelling. His conduct in the sixth grade was listed as unsatisfactory, and he was reading below a third-grade level. In seventh grade, he received all Fs except for a D in music. He received no grades in the eighth grade due to nonattendance, at which time he dropped out of school.

When the [petitioner] was sixteen years old, he was a witness to a crime in his neighborhood and testified for the State. The transcript from that trial revealed that he had witnessed a robbery and murder at a neighborhood grocery store. The [petitioner] later identified the perpetrators of the crime in a police line-up.

-12-

The [petitioner] was thirty-five years old at the time of the victim's death. Joyce Rice, the [petitioner]'s sister, testified that the [petitioner] was the youngest of six children, only three of whom are still alive. She confirmed that the [petitioner] had witnessed a crime and believed that he saw the men being killed. She explained that one of their brothers was murdered over gambling by being hit in the back of the head and thrown into a swimming pool. She cared about the [petitioner], but conceded that he had been using "crack" cocaine for about two years, and as a result, his life was going downhill.

Dr. Joseph Angelillo met with the [petitioner] several times and conducted various intellectual and personality tests. He also reviewed the [petitioner]'s school records and social history. The [petitioner] had a "significant amount of loss in his life." The fact that he was a witness to murder was also a significant event. Other significant factors included his inability to retain a job for any length of time, his use of "crack" cocaine, marijuana and alcohol, his experimentation with LSD, and his past suicide attempt. Dr. Angelillo explained that drug use remains an important factor because of "one's erratic behavior, moods, unpredictability, change in personality, change in impulse control, and things like that with the repeated use of that particular substance."

Intellectual tests showed that the [petitioner]'s intellect "was in the upper end of what is termed the borderline range. That was the full scale IQ . . . 79." Dr. Angelillo opined that the [petitioner] suffers from a delusional and paranoid disorder, but that these are factored with his history of drug and alcohol abuse. He has a "dependant personality . . . as well as passive - aggressive . . . personality traits." The delusional disorder "would impair [his] ability to construe, to manage to make sense out of day-to-day situations."

Dr. Angelillo admitted that during testing, he found the [petitioner] to be "very angry . . . somewhat sullen, mistrustful, and generally self-indulgent." A computer generated test indicated that the [petitioner] has a disregard for authoritative figures, tends to deny responsibility, and blames others for his problems.

Corporal Barbara Williams, an employee of the Shelby County Sheriff's Department, testified that there were no incidents of violence reported involving the [petitioner] since he had been confined at the Shelby County Jail. The [petitioner] did attempt suicide, however, on July 5, 2000.

Rice, 184 S.W.3d at 653-61.

## POST-CONVICTION PROCEEDINGS

Lead Counsel testified that he graduated from law school in 1996 and that approximately 95% to 99% of his practice was devoted to criminal defense. The Petitioner's case was his fourth or fifth capital case.

An order appointing Lead Counsel was filed on July 27, 2001, which was entered nunc pro tunc on July 20, 2001. Lead Counsel said that prior to his appointment, the trial judge met with him in chambers and stated he would appoint Lead Counsel only if he would be ready to try the case on the scheduled date. The trial was scheduled for January 2002. Lead Counsel believed that the trial may have originally been scheduled for an earlier date and that the January 2002 date was the second setting. He said that at the time, a large amount of work still needed to be completed in the case.

Lead Counsel testified that in prior cases, the trial judge had provided him with the tools necessary to prepare the defenses. He knew Mr. Skahan received more resistance from the trial judge in obtaining funding for experts than he was accustomed to seeing in capital cases. He also knew obtaining funding would be a challenge in the Petitioner's case based upon his conversations with Mr. Skahan. Lead Counsel said,

> Before I sought experts I really had my documentation super loaded. I had probably ten or twelve times the amount of supporting documentation for every resource I was seeking and then I had absolutely no trouble. Now I don't know if it was because I had a lot of documentation, because I wasn't Gerald Skahan or because we're nearing trial, I don't know. But I spent a lot of time and effort and energy getting loaded to bear to ask for resources and then [the trial judge] said okay, no problem, here it is.

Lead Counsel did not know when he began requesting funding from the trial judge. Upon being appointed to the case, he read the file and determined what tasks needed to be completed.

Lead Counsel said that in obtaining funding, he sought assistance from the Tennessee Board of Professional Responsibility ("BPR") and many capital defense attorneys. He identified a letter dated October 29, 2001, that he wrote to Lance Bracy, the then chief disciplinary counsel for the BPR, in which he stated that "[t]he judge is adamant that the case should be tried on January 7th of 2002, and would not appoint me until I agreed that I could be ready. Now the Court is making me jump through hoops to obtain basic tools to defend

-14-

the client." Mr. Bracy responded with a letter stating that Lead Counsel could ethically seek to withdraw if the State did not provide the basic constitutionally mandated tools to defend the Petitioner. Mr. Bracy said it was not his place to identify those tools. Lead Counsel wrote letters on October 29, 2001, to defense attorneys and others explaining his case, his concern of the Petitioner's mental health issues, and his reasons for needing a mental health expert. He requested each person provide him with an affidavit to support the necessity for the funding. Lead Counsel acknowledged that at the time that he wrote the letters, the trial was slightly more than sixty days away.

Lead Counsel said that on October 29, 2001, he did not believe the mitigation investigation was in "good shape." He recalled a conversation with an employee of Inquisitor about the fact that they had stopped working on the case due to lack of funding. He said the decision regarding whether to request a continuance at that point depended upon what tasks needed to be completed. Lead Counsel identified a letter that he had written to Ron Lax, the fact investigator; Glori Shettles, the mitigation investigator; and Co-Counsel with regard to the need to seek additional funding. The letter stated, "I don't think we want language that implied Inquisitor was off the job on this case ever for any reasons. I know how important these issues are but we have got to play the game as far as documentation goes." Lead Counsel testified that although he was not "super happy to be seeking twelve affidavits" to support funding requests that were routinely granted, the letter indicated that he wanted the investigators and Co-Counsel to "quit griping about it" and "just do it."

Lead Counsel testified the investigation would not have been completed sixty days prior to trial. He also needed additional funding for the investigators to assist in coordinating the witnesses who were to testify at trial. In order to obtain additional funding for Inquisitor, Lead Counsel and Mr. Lax met with the trial judge in chambers. The trial judge wanted to ensure that the investigation could be complete by the trial date in January if he approved the request for funding from Inquisitor.

Lead Counsel said that on October 29, 2001, he was gathering information in order to draft a motion and obtain funds to retain a mental health expert. According to his notes from October 16th, he was considering a psychologist, a psychiatrist, and a neuropsychologist. Lead Counsel explained the notes were the result of "brainstorming." An order was entered on November 5th approving funds to retain Dr. Joseph Angelillo, a psychologist. Ms. Shettles provided various records to Dr. Angelillo. Dr. Angelillo submitted his report to Lead Counsel on December 16th. Lead Counsel did not consider receiving a psychologist report two to three weeks before trial a good practice. He did not know why he did not request funds to retain a mental health expert in August 2001. He believed he may have still been reviewing the case file and determining what tasks needed to be completed. Lead Counsel acknowledged that in the beginning of August 2001, he attended a death

penalty college in California during which he was required to submit a case for review. He submitted the Petitioner's case and stated he intended to have an extensive psychological evaluation conducted.

Lead Counsel testified he would have liked to have had other mental health professionals evaluate the Petitioner also. At that point in his career, he did not believe he had ever used a neuropsychologist. Lead Counsel did not feel he could have pursued additional evaluations due to the lack of time before trial. He said he spent quite a bit of time preparing his motions for funds to retain an expert that in retrospect, he did not believe was necessary. He believed such preparation was necessary at the time, however, due to the issues that Mr. Skahan faced in requesting funds from the trial judge.

Lead Counsel noted Dr. Angelillo did not recommend additional evaluations by other experts in his report. He did not ask Dr. Angelillo whether he should seek to retain a doctor of addiction medicine. Lead Counsel acknowledged that an evaluation of the Petitioner by a neuropsychologist would have been more thorough than an evaluation by a psychologist.

Lead Counsel said he performed the majority of the work in preparing the case for trial. He and Co-Counsel did not divide the preparation of the guilt and penalty phases. Rather, when Lead Counsel needed Co-Counsel's assistance, he would contact Co-Counsel and then follow up with a telephone call to ensure that the task had been completed. Lead Counsel recalled that Co-Counsel attended two meetings with the entire defense team and that he also met with Co-Counsel separately on other occasions.

Lead Counsel stated he visited the crime scene on at least two occasions with the investigators. The Petitioner's family members gave him access to the house under which Tony Evans alleged he crawled. Lead Counsel visited the house at least once or twice. He believed Tony Evans lied when he testified that he crawled under the house and heard a conversation between the Petitioner and the Co-Defendant.

Lead Counsel noted the Petitioner gave a statement to police and participated in a videotaped walkthrough of the scene with officers. He described the statement and video as compelling evidence that the Petitioner was involved in the victim's death. He said their theory of defense was that the Petitioner's statement was false, that the co-defendant had an alibi, and that Mr. Evans was not someone who should be trusted. Lead Counsel testified that the defense theory as to why the Petitioner's statement was false was that he was easily led by police because he suffered from severe mental health deficits. Lead Counsel acknowledged that favorable testimony from an expert in the area of false confessions would have been helpful. He did not seek funds for this type of expert.

-16-

Lead Counsel believed the victim's body was too decomposed for a finding as to whether the victim had been raped.   He did not retain an independent forensic pathologist to contradict Dr. Gardner's testimony regarding the injury to the victim's vaginal area. He did not know whether a forensic pathologist would have testified that Dr. Gardner's finding would have been impossible based upon the condition of the victim's body.  He did not recall whether he spoke to Dr. O.C. Smith regarding the case although it was on his list of tasks that he needed to complete.

Lead Counsel said that in a capital case, the mitigation investigator generally should interview all of the petitioner's family members.  If the mitigation investigator does not have sufficient time to complete the interviews, counsel should request a continuance.  Lead Counsel believed everyone who was willing to cooperate had been interviewed.  He recalled that many of the Petitioner's family members were angry with the Petitioner because they believed co-defendant Mario Rice, the Petitioner's nephew, would not have been charged had the Petitioner not implicated him.  While they were able to contact quite a few family members, the relatives were not willing to testify at trial.  Lead Counsel could not recall who agreed to cooperate and who refused but said the Petitioner had little family support at trial.

Lead Counsel testified he initially planned to present evidence during the penalty phase of the Petitioner's social history through Glori Shettles.  The State objected to Ms. Shettles's testimony as hearsay, and the trial court limited her testimony.  Lead Counsel said that regardless of the trial court's ruling, he still presented the evidence through Ms. Shettles. The trial court also allowed trial counsel to continue the presentation of their proof until Monday so that they may present the testimony of other family members. Upon returning that Monday, the defense did not present any additional witnesses and rested its case. Lead Counsel said he believed that if any additional witnesses were willing to testify, they would not have rested. He understood the Petitioner's family members were reluctant to testify.

 Lead Counsel did not believe the Petitioner's competency was at issue.  He believed the trial court ordered Midtown Mental Health Center to conduct a competency evaluation of the Petitioner as a precaution. Dr. Lynn Zager, who conducted the competency evaluation, wrote Lead Counsel a letter requesting additional information and informing him that the information and her findings would not be considered confidential.

Lead Counsel acknowledged that defense counsel in a capital case should argue to the jury that the death penalty should be reserved for the worst offenders and said he believed he made the argument to the jury.  He did not believe he told the jury that the Petitioner's case was the worst case that he had ever had.  He explained that if he had made such an argument, he did so to gain some credibility with the jury. He further explained he was attempting to separate the Petitioner "from the Unabomber or the man that blew up

Oklahoma's federal courthouse or people that intentionally got out there to ruin someone's life with premeditation." Lead Counsel did not believe the Petitioner planned to hurt the victim "in a cold and calculating way" and attempted to persuade the jury to look past the guilt phase and give the Petitioner "a fair shot as to life in prison."

Lead Counsel testified his statement to the jury that the Petitioner's life once had merit and promise was a segway into his discussion of the Petitioner's tough childhood and his decision to testify against the men who he witnessed commit murder during a robbery. Lead Counsel also requested the jury not consider life without parole as a possible sentence. Based upon the Petitioner's age, he believed a sentence of life and a sentence of life without parole did not differ. Lead Counsel said, "I think we would have been winning big to have pulled out life without parole after seeing the proof in this case."

Lead Counsel said that while he believed the Petitioner committed the offense, he did not believe Mr. Evans' testimony was sufficient to support the conviction. He also said that absent the video of the Petitioner's walkthrough of the crime scene with the officers, the jury may not have convicted him of first degree murder.

On cross-examination, Lead Counsel testified he presented evidence of the Petitioner's I.Q. during the guilt phase to lessen the impact of evidence presented by the State. He said when he "really loaded up" his motion for funds to retain a psychologist, he did not obtain a great amount of resistence from the trial judge in approving the funds. Lead Counsel relied upon Dr. Angelillo to determine the tests to be administered to the Petitioner and the protocol for the evaluation. He presented evidence of the Petitioner's I.Q., which fell within the borderline range of intelligence, to challenge the validity of the Petitioner's confession and his participation in the offense. Dr. Angelillo also testified to the Petitioner's long history of cocaine and alcohol abuse and his experiments with LSD. Lead Counsel said that at trial, the Petitioner appeared as if he fell within the profile of a drug addict and lived a very hard life. Lead counsel also presented evidence supporting an alibi defense.

Lead Counsel testified Ms. Shettles knew how to obtain the necessary records and persuade people to relax and open up to her. She composed an outline of the Petitioner's social history and mitigation themes. The themes included the Petitioner's early years of trauma, his witness to trauma, abuse, illness, the break up of the family, and other significant losses that he experienced. Ms. Shettles informed Lead Counsel that although James Tools, the Petitioner's uncle, resided in Memphis, he had virtually no contact with the Petitioner's mother or the Rice children due to his private nature.

Lead Counsel noted evidence was presented during the penalty phase regarding the Petitioner's school history, his drug and alcohol abuse, his family's poverty, the poverty

stricken neighborhood in which he was raised, the deaths of a number of his siblings, the effect of their deaths on the Petitioner, his witnessing of a murder, his educational background, his low I.Q., and his difficulty in coping with his problems. Dr. Angelillo testified the Petitioner suffered from a significant psychological disturbance and had symptoms of delusional disorder. Lead Counsel did not want to present evidence that the Petitioner was violent toward women unless such evidence supported the theory of his psychosis. He noted the Petitioner's wife testified he vowed to "get her" after she left him. Lead Counsel testified the trial court instructed the jury on nineteen mitigating circumstances.

Lead Counsel recalled friction from the Petitioner's family members and noted that many of them refused to cooperate. The one witness who agreed to assist was bitter about the fact that the co-defendant was also charged. Lead Counsel noted others agreed to speak to the defense team but refused to attend trial. He was afraid that if he subpoenaed these witnesses and presented their testimony, they would turn on the Petitioner. He recalled one witness had already offered testimony at trial that differed from her statement to the investigator.

Lead Counsel testified he made the decisions about how to proceed in the case. Before making any big decision, he first discussed it with the defense team. He said Co-Counsel was not the "stronger lawyer." On re-direct examination, Lead Counsel said he did not want Co-Counsel as his second chair on future capital cases because he did not believe Co-Counsel expended the time required to prepare for such a case.

Lead Counsel said that because family members refused to cooperate and the trial judge limited Ms. Shettles' testimony, psychological evidence became a large part of the mitigation. Had he believed that he needed additional time to prepare evidence of mitigation, he would have requested a continuance. He was not sure that the mitigation evidence would have improved had the trial been continued. While Lead Counsel acknowledged he could have requested funds for a neuropsychologist and a psychiatrist at the same time that he requested funds to retain Dr. Angelillo, he did not believe the trial judge would have granted his request absent evidence of particularized need. Dr. Angelillo did not recommend additional evaluations in his report. Lead Counsel acknowledged that he may have been able to establish particularized need for other mental health professionals by presenting affidavits in the same manner in which he established particularized need for Dr. Angelillo's services.

Co-Counsel was licensed to practice law in Tennessee in April 1993 and represented one other capital defendant prior to the Petitioner's case. He estimated that Lead Counsel performed 60% of the work on the case while he performed 40% of the work. Lead Counsel decided how to try the case with his input Lead Counsel decided that he would conduct

opening and closing arguments and identified those witnesses who he would examine at trial.

Co-Counsel testified to the difficulty in obtaining funds to retain investigators and experts. He and Mr. Skahan initially requested funds to retain investigators and experts. The trial court did not believe the experts were necessary and denied their request. They eliminated some of the experts and requested funds for the remaining experts. The trial court again denied their requests. These motions were presented to the trial judge in chambers, and a court reporter was not present. One such expert was Dr. Fred Steinberg, a forensic psychologist, for whom Co-Counsel requested funding shortly after Dr. Steinberg prepared an affidavit on May 31, 2001. The trial court eventually approved funds for a psychologist shortly before trial. The trial court also approved funding for investigators but only approved what Co-Counsel considered to be a small amount. Co-Counsel believed the trial court's denial of funds for experts detrimentally affected their ability to present a defense.

Co-Counsel said he did not visit the crime scene but relied upon information gathered by the investigator and the State's photographs of the scene. He stated he had two to four lengthy meetings with the investigators per month and was familiar with the crime scene.

Co-Counsel recalled the theory of defense was based upon the use of illegal drugs and alcohol by the Petitioner and his co-defendant. They questioned the methods that the investigators used to obtain the statements from the Petitioner and examined the lack of forensic evidence and veracity of one of the State's witnesses. Co-Counsel explained that the goal of the defense was to place the Petitioner and the co-defendant at a place away from the scene at the time of the victim's death. He said that whenever he and Lead Counsel met with the Petitioner, "the stories were conflicting, the details were fuzzy and it seemed like every time we went we had different sets of notes. And so it was our theory that it's even possible that they weren't even, they weren't even there."

Co-Counsel testified that while the State had evidence placing the Petitioner and his co-defendant at the scene of the murder, no weapon was recovered. He noted that the forensic evidence was sparse and that there was little evidence establishing sexual abuse. He acknowledged that the State had statements from both the Petitioner and the co-defendant and a statement from a witness who was "totally unreliable." Co-Counsel said he was surprised by the jury's verdict. He also said that while trial counsel did not retain a forensic pathologist to assist them, he believed such an expert was vital.

Co-Counsel was born with hearing problems and was almost deaf in his right ear. At trial, he had a head cold that further affected his hearing. He requested a continuance, but the trial court denied the request. Co-Counsel did not feel comfortable examining witnesses until near the end of trial. He found it difficult to hear the testimony while sitting at the

defense table and any discussions during bench conferences. When trial counsel would return to their seats following a bench conference, he would learn of the trial court's ruling through notes from Lead Counsel.

On cross-examination, Co-Counsel testified that although the trial judge ultimately agreed to approve funds to hire Inquisitor to conduct the fact and mitigation investigations, the trial judge was extremely hesitant to do so because he believed Inquisitor over charged and performed more work than was necessary. Co-Counsel acknowledged that Inquisitor had the reputation as being one of the best investigation firms in the field of capital defense.

The post-conviction court agreed to continue Co-Counsel's testimony to allow him to review his file. When direct examination continued, Co-Counsel identified a list that he had complied with Mr. Skahan of experts that they believed would assist them in the Petitioner's defense. The list included a request for funds to retain Inquisitor for $45,000 at $65.00 per hour; a jury consultant for $500,000 at $100.00 per hour; Dr. Steinberg for $10,000 at $150.00 per hour; and a forensic specialist for $10,000 at $100.00 per hour. Co-Counsel said the trial judge approved funds to retain Inquisitor but refused to approve funds for the experts on the list. The trial judge informed Co-Counsel that the experts requested were not necessary for this type of case. Co-Counsel noted the order approving the funds for Inquisitor was entered on June 1, 2001. He requested $10,000 for investigation services related to the guilt phase and $15,000 for mitigation services. The trial judge, however, only approved $5,000 for investigation services related to the guilt phase and $5,000 for mitigation services.

Co-Counsel said that during the penalty phase, the trial court refused to allow Glori Shettles, the mitigation investigator, to testify regarding the Petitioner's background and family history. Ms. Shettles testified on a Saturday afternoon, and trial counsel requested and were granted until Monday to prepare additional witnesses to testify in light of the trial court's ruling. Co-Counsel was unable to recall whether he and Lead Counsel were able to locate family witnesses or whether they presented additional proof that Monday. He did not believe they presented any additional evidence. He did not recall what efforts were made to contact family members or whether the family members refused to cooperate. Co-Counsel described the case as "touchy" as it was an inner-family crime. He said some family members were very reluctant to discuss the Petitioner, while others were more forthcoming.

On cross-examination, Co-Counsel testified he met with the investigators frequently. He recalled obtaining discovery from the State as a joint effort. He did not recall whether additional funds for Inquisitor were requested from the trial judge when the initial $10,000 had been expended.

Co-Counsel stated trial counsel met with the Petitioner on many occasions while preparing for trial and tried to keep the Petitioner informed of their investigation. Co-Counsel described the Petitioner as helpful in the defense and said the Petitioner identified people who were involved in his life and people who were involved in the victim's life. At some point, the State offered a sentence of life without parole, but the Petitioner decided not to accept the plea. Co-Counsel said that when he and Lead Counsel explained the offer to the Petitioner, he seemed to be coherent and listened to them.

Co-Counsel testified the defense at trial was that the Petitioner did not commit the offense. The defense maintained the Petitioner's statement was coerced due to his low I.Q. and his mental state at the time in which he gave the statement. Co-Counsel said their goal was to remove the Petitioner from the crime scene at the time that the victim was killed. Their defense theory was that Tony Evans committed the offense. Co-Counsel stated that in investigating Mr. Evans, the investigators at Inquisitor examined his divorce paperwork, his criminal record, his presentence report, and juvenile court records regarding custody issues. They also presented evidence of an alibi for Mario Rice, the co-defendant. Co-Counsel explained they believed that if they could establish that the co-defendant was elsewhere at the time of the offense, it would undermine the Petitioner's statement to the police that they were both involved in the offense and strengthen their argument that the Petitioner's statement was false.

Co-Counsel said Lead counsel presented Dr. Angelillo as a witness during the guilt phase to establish that the Petitioner's I.Q. was low in support of their argument that the Petitioner had been manipulated by the police officers. Dr. Angelillo also testified regarding the Petitioner's use of alcohol, cocaine, and LSD. On the day of the offense, the Petitioner had consumed alcohol and cocaine and had experimented with LSD. Co-Counsel testified the victim's cause of death was not contested at trial. He explained that because the defense theory was that the Petitioner did not commit the offense, he did not believe an exploration into the victim's cause of death was necessary.

Co-Counsel testified that although he did not expect a guilty verdict, the defense team was prepared for the penalty phase. During the penalty phase, trial counsel sought to present evidence of the Petitioner's mental history, childhood, and interactions with his family to "[m]ake him more of a person rather than this heinous animal that had been painted during the trial." They attempted to establish the Petitioner lived a tragic life. They were not attempting to excuse his conduct but were attempting to make him sympathic to the jury. Co-Counsel recalled presenting the testimony of the Petitioner's sister regarding the family tragedies, including the Petitioner's witnessing a murder and their brother's drowning. Investigators obtained the Petitioner's school records, institutional records, and birth records. Co-Counsel recalled presenting proof that the Petitioner was not a good student and had not

been a problem while in jail. The defense also called Dr. Angelillo to provide more detail regarding the Petitioner's personality traits, his way of coping with problems, his tendency to become overwhelmed by circumstances, the effect of his low I.Q. on how he processed information, and his inconsistent work history.

Co-Counsel did not believe that any expert found the Petitioner reacted violently against women when confronted by loss or problems in his life. He said he would not have wanted the jury to know that the Petitioner was violent toward women. He also said no evidence was presented during the penalty phase that the Petitioner was "out of control" because such evidence was contrary to their mitigation theme.

Co-Counsel said he and Lead Counsel requested the trial court instruct the jury regarding several mitigating factors, including the Petitioner's low I.Q., his drug use, his poor educational background, and the deaths in his family. The trial court did not instruct the jury on every mitigating factor requested. Mitigating factors that the trial court instructed the jury included any testimony that the Petitioner was diagnosed with a significant psychological disturbance or that he was intoxicated, which may have substantially impaired his capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law and may have substantially effected his judgment.

On redirect examination, Co-Counsel testified he had approximately ten meetings or less with Mr. Lax and three to four meetings with Ms. Shettles. Each meeting with Ms. Shettles lasted for at least one hour. Co-Counsel did not interview the Petitioner's mother and did not know whether the investigators or Lead Counsel interviewed her. He believed Larry Rice was contacted. He did not recall speaking to Andrew Folson or James Tools.

Co-Counsel said one of the defense theories was that the Petitioner's statement was the result of coercion by officers. He cross-examined the officers who conducted the questioning but did not believe he and Lead Counsel ever considered hiring a false confession expert.

Co-Counsel was responsible for conducting the cross-examination of Dr. Garnder, the medical examiner. At the conclusion of the State's direct examination of the doctor, he expressed to Lead Counsel and the Petitioner his concerns that any cross-examination would open the door to allow the State to imply that the victim was raped when no evidence of rape had been presented. He did not believe Dr. Gardner's testimony on direct examination had adversely affected the defense theory. Co-Counsel stated he did not question Dr. Gardner on cross-examination because he "didn't want to open any door for the state to come back in and present evidence that was not, that was not even presented to begin with." He did not recall Dr. Gardner testifying that the victim had been raped or sexually assaulted. No DNA

-23-

evidence was presented to establish rape or sexual assault. Co-Counsel acknowledged that the lack of DNA evidence could be inculpatory.

Co-Counsel said the Petitioner's sister, Joyce Rice, who testified during the penalty phase, may have been the only member of the Petitioner's family who agreed to testify. He also said that the defense team attempted to reach numerous family members and that a number of them refused to attend trial. Co-Counsel could not recall whether co-defendant Mario Rice was Joyce's son and acknowledged that the Petitioner had implicated the co-defendant in the offense.

Dr. O'Brian Clarey Smith, a forensic pathologist, was admitted by the post-conviction court as an expert in forensic pathology. Dr. Smith was the medical examiner at the scene where the victim's body was found and participated in the autopsy. He testified the victim's body was discovered in an advanced state of decomposition. He believed Dr. Gardner's testimony at trial regarding the cause of the victim's death was accurate.

Dr. Smith characterized Dr. Gardner's testimony that decomposition to the vaginal area could be explained by trauma or some type of injury prior to the victim's death as misleading. Dr. Smith explained that other practitioners commonly identified relaxation of the various openings of the body, such as the anus, vagina, and uretha, as signs of abuse when they were simply the natural occurrence of relaxation following death. The combination of the opening of the body and the decomposition process during which bodily fluids exit those areas attracted carnivorous insects and animals. As a result, the area was prone to early decomposition or anthropophagy or the eating of the tissues by creatures which could produce an artifact that mimicked injury. Dr. Smith found no evidence of severe bruising or physical trauma in the area. He explained:

> To have that type of knowledge about the preferential decomposition of the groin area and be able to state that you think that an injury occurred prior to death in that area is unsupportable due to the fact that the child was out there for over a week in circumstances that are absolutely ideal for the consumption of that dead body by carnivorous animals and insects.

On cross-examination, Dr. Smith testified the amount of decomposition in the groin area could have been associated with trauma. He said, "Trauma cannot be ruled out." He believed Dr. Gardner overstated the trauma as a possibility and in linking any trauma to have occurred prior to the victim's death. Rather, an injury could have occurred after the victim's death.

Dr. Smith said that when he first examined the victim during the autopsy, there were

no internal organs or soft tissue to examine. DNA samples were not taken due to the decomposition of the surface of the body. On redirect examination, Dr. Smith testified that due to the condition of the victim's body, Dr. Gardner's "statement that there was trauma in that area before death has no support from any observation that could be made from that area."

Brandy Downey Harwell, the victim's step-sister, testified she was interviewed by an investigator in 2001 regarding the events of June 18, 2000. The victim was staying with her and her family that weekend. Ms. Harwell said that on June 18th, she, the victim, her sister, and a few other friends walked around the neighborhood just as they normally did on the weekends. They went to the New Chicago Grocery Store where they saw the Petitioner. Ms. Harwell said the Petitioner and Tracie Rice, the victim's mother and the Petitioner's wife, were known users of crack cocaine. The victim's mother had recently left the Petitioner. Ms. Harwell recalled that when she saw the Petitioner at the store, he was drinking a beer and talking to a known drug addict and dealer.

Ms. Harwell testified she saw the Petitioner again as they were walking toward Bellevue. The Petitioner spoke to the victim and then left. Ms. Harwell did not see the Petitioner again that day. They then walked to the Petitioner's house to see if the victim's mother was there. The victim also wanted to walk the Petitioner's dog. When they arrived, the victim went inside the house while Ms. Harwell and her friends remained outside. Ms. Harwell saw the Petitioner's parents sitting outside and never saw the Petitioner exit the house. The victim came back outside, told her friends that they needed to leave, and reentered the house. Ms. Harwell said they left without the victim at approximately 3:30 p.m. or 4:00 p.m.

Monica Downey testified that on June 18, 2000, she, Ms. Harwell, Erika Downey, Lakeisha Ford, and the victim walked to the New Chicago Grocery Store where they saw the Petitioner. The Petitioner spoke to the victim, but Ms. Downey did not know what he told the victim. The girls then walked to the Petitioner's house where the victim was supposedly going to walk the Petitioner's dog. Ms. Downey was unaware of whether the victim had walked the Petitioner's dog on prior occasions. The victim remained at the residence, and Ms. Downey and her friends left.

Ms. Downey stated the victim never indicated that she was afraid of the Petitioner but rather saw him as a father figure. She did not know whether the Petitioner had been drinking alcohol that day. She did not recall telling an investigator in 2001 that she believed that the Petitioner was drinking a beer. She also did not recall telling the investigator that the victim often walked the Petitioner's dog and that she did not think it was strange that the victim wanted to do so. Ms. Downey acknowledged that the Petitioner had the reputation in the

neighborhood as a drug user. She did not see the Petitioner at his residence and did not see the co-defendant at all that day.

Glori Shettles, a mitigation investigator with Inquisitor, testified her duties included obtaining information from the client regarding background, school, family makeup, juvenile records, drug and alcohol history, medical history, and history of mental health. She generally gathered records for three generations or as far back as she could go. She also generally sought to interview as many people who had contact with the client as she could, including teachers and former employers.

Ms. Shettles said a mitigation investigation generally took eighteen months to complete. The client and relatives may have difficulty recalling events or may not be forthcoming. Ms. Shettles must attempt to build a rapport with the family members so that they will reveal family secrets. She preferred to interview the family members more than once and preferred to discuss various records with the client and family members after receiving and reviewing them.

Ms. Shettles testified she conducted the mitigation investigation for both the Petitioner's trial and post-conviction relief hearing. She said that because the Petitioner's nephew was a co-defendant, some of the family members sided with the co-defendant and were not as cooperative prior to trial. When questioned regarding the family's cooperation in preparing for the post-conviction hearing, Ms. Shettles replied, "I think time, literally, time passing had made a difference." She understood from another investigator with Inquisitor who interviewed these family members in preparing for the post-conviction hearing that they were more cooperative and provided more information.

Ms. Shettles was told that James Tools, the Petitioner's maternal uncle, was a very private person and did not associate with the rest of the family often. She attempted to locate Mr. Tools closer to trial but was unable to do so. She said Mr. Tools was interviewed in preparing for the post-conviction hearing and provided information that she was told prior to trial that he did not have.

Ms. Shettles testified she believed the preparation of the mitigation aspect of the trial was very poor. Trial counsel focused more upon preparing for the guilt phase of the trial. She explained that in preparing for the guilt phase of the trial, counsel should also be aware of the results of the mitigation investigation in order to determine whether information obtained during the mitigation investigation can be incorporated into the presentation of the evidence during the guilt phase. Ms. Shettles believed that a collaborative effort between the members of the defense team was lacking in the Petitioner's case. She understood that Co-Counsel was responsible for preparing the mitigation aspect of the case but recalled meeting

with Co-Counsel on only one occasion and did not recall any conversations or correspondence with him.

Ms. Shettles recalled meeting with the defense team on multiple occasions a little more than a month before trial. She said such meetings within a short period of time before trial were unusual and did not allow them time to prepare a mitigation strategy. She did not recall a strategy for the mitigation. She did not believe any method was developed to present the information known about the Petitioner to the jury either through a witness or expert testimony.

Ms. Shettles said her first entry in her billing records was May 1, 2001. She did not recall when Lead Counsel began representing the Petitioner or whether there was a period of time in which he was not involved in the case. Ms. Shettles said that based upon her records, she did not have any discussions with Lead Counsel between August 6 and December 7, 2001, regarding the status of the mitigation investigation. She knew Lead Counsel had sent letters in preparing his motions requesting funds for an expert and knew from the correspondence that Lead Counsel had read the records and her memoranda.

Ms. Shettles met with Lead Counsel on December 6, 2001, and did not believe Co-Counsel was present. She met with both Lead Counsel and Co-Counsel on December 20th. The next day, she spoke to Lead Counsel. On January 2, 2002, she met with Mr. Lax and Lead Counsel. She met with trial counsel, Dr. Angelillo, and the Petitioner three days later and testified on January 12th. Ms. Shettles testified that to her knowledge, Co-Counsel never attempted to meet with any of the family members or any other witnesses except possibly those who testified during the penalty phase. She had no personal knowledge of any substantial preparation of the mitigation evidence by Co-Counsel prior to the penalty phase.

Dr. Angelillo was appointed shortly before trial. Ms. Shettles believed that retaining a mental health expert within one to two months before trial was unusual. She acknowledged that an evaluation conducted by an expert such as Dr. Angelillo could lead to the need for other experts. Ms. Shettles testified both a psychologist and a neuropsychologist were typically used in cases when the petitioner had limited education and learning disabilities. A neuropsychologist was not used in the Petitioner's case. Ms. Shettles was aware of the Petitioner's drug and alcohol usage and believed his case was the type in which counsel would request funds to retain an addictionologist. She believed an expert who could explain the effects of alcohol or drugs would have assisted the jury in putting the Petitioner's actions into context. Ms. Shettles believed additional investigation into the mitigation aspect of the trial was needed, but she did not have time to do it before trial. As a result, she did not believe that the case was ready for trial.

On cross-examination, Ms. Shettles testified she did not recall when she was appointed at the trial level but thought it may have been in May 2001. She began the mitigation investigation shortly after the appointment and gathered the majority of the records within a few months of the appointment. She acknowledged that many of the family members would not cooperate prior to trial because the Petitioner had implicated his nephew. Some of those relatives who refused to cooperate for purposes of trial later cooperated for purposes of the post-conviction hearing.

Ms. Shettles said the defense team never discussed or developed themes for mitigation. She, however, expended a large amount of time developing themes and a social history. She addressed the background of both of the Petitioner's parents, his childhood and siblings, his witnessing of trauma and abuse, his sister's illness and death, the breakup of the family, and deaths in the family and other significant losses. She included a discussion of how the Petitioner's neighborhood changed from a blue collar neighborhood to an impoverished neighborhood. She also included a discussion of the Petitioner's limited education and his witnessing of a homicide and its effect on him. Ms. Shettles noted that the Petitioner was worried about possible retribution for testifying against the defendants and that his witnessing of the murder affected the way that he viewed the world. She obtained a transcript of the Petitioner's testimony at that trial.

Ms. Shettles noted the Petitioner's problems with relationships and abuse, witnessing abuse by his father, and the death of his brother as other areas that affected his life. She further noted his history of drug abuse which also involved the victim's mother, the way in which he viewed the world, his feelings of powerlessness, and his feelings of being unloved. Ms. Shettles' notes from her meeting with trial counsel on December 6, 2011, show that they discussed the Petitioner's borderline I.Q., his jail records, his issues with family, the deaths of his siblings and their impact, and his testimony for the State in the trial of defendants Sample and McKay.

Ms. Shettles testified she included a discussion of potential witnesses in her memorandum which included the Petitioner's sister, Joyce Rice, and his brother, Larry Rice. Joyce, who was also the co-defendant's mother, told Ms. Shettles that the Petitioner's other siblings would not help him. Ms. Shettles said she did not believe Joyce and Larry were able to articulate good qualities or positive aspects about the Petitioner. Ms. Shettles was allowed to testify at trial about the deaths of the Petitioner's sister and brother. She did not listen to the testimonies of Dr. Angelillo or Joyce at trial.

Ms. Shettles interviewed Rossette Folsom, a relative of the Petitioner, in an attempt to obtain background information on the Petitioner's father. Ms. Shettles said she did not believe Ms. Folsom provided all information that she had and was vague with regard to the

information that she provided.

Ms. Shettles testified she obtained a number of records. She attempted to locate the Petitioner's teachers but found it difficult because the school records only recorded the last names of the teachers. In investigating the case for the post-conviction relief hearing, Ms. Shettles was not able to locate any additional records or teachers.

On January 7, 2002, Ms. Shettles drafted an email listing all the tasks that she needed to complete before trial. These tasks included obtaining death certificates for the Petitioner's grandparents and a certified copy of the indictment from his prior testimony; issuing and serving a subpoena for jail records; obtaining a letter regarding the location of the defendant against whom the Petitioner testified; copying and binding the transcript of that testimony; binding the bridge exhibit; and copying the death certificates. Ms. Shettles believed she completed all of these tasks prior to trial.

On redirect examination, Ms. Shettles recalled problems with the trial judge approving funding. Although she did not recall stopping the investigation as a result, she identified a memorandum that reflected a work stoppage two months before trial. She said other tasks could have been and should have been completed prior to trial. On re-cross examination, Ms. Shettles acknowledged that in these types of cases, there is always something left to do.

James Tools, the Petitioner's uncle, testified he was aware of the Petitioner's charges in 2000 and 2001 but was not interviewed. At that time, he was living in Whitehaven and employed at the United States Postal Service. He said his family knew where he could be located.

Mr. Tools was born in Memphis to Josh and Barbara Tools. He had one sister, Delois Rice, the Petitioner's mother. She passed away two to three years before the post-conviction hearing. When Mr. Tools was seven years old, Delois and Earnest Rice, the Petitioner's father, eloped. They began having children the next year and had a total of six children: Pam, Ricky, Joyce, Larry, Carolyn, and the Petitioner. Pam was the oldest, and the Petitioner was the youngest.

Mr. Tools said Earnest worked in construction while Delois was a homemaker. Earnest was not educated and could not read and write. Delois could read and write but never graduated from high school. When the Petitioner was six or seven years old, Earnest and Delois separated.

Mr. Tools said Delois was a good mother but did not demand that her children follow her instructions. He believed Delois cared for her children as best as she could. The family

lived in a bad neighborhood where the Petitioner and his siblings were exposed to fights, stabbings, alcohol, and drugs. Due to Delois' lack of supervision, Mr. Tools believed the children were drinking alcohol in the home. Delois once told him that her boys were gambling in the home.

Mr. Tools testified Pam was very bright and graduated from high school. She planned to attend college, and Mr. Tools' father planned to pay her tuition. Pam was subsequently diagnosed with lupus and confined to a wheelchair. She remained in a wheelchair for three to four years before she died at age twenty-two or twenty-three. The Petitioner was eleven, twelve, or thirteen years old at the time of her death. Mr. Tools believed that Pam's death had a negative effect on the Petitioner.

Mr. Tools stated Ricky drowned in a pool when he decided to go for a swim after drinking alcohol. Carolyn had two children and lived with Delois. Mr. Tools did not believe Carolyn graduated from high school or that she had a problem with drugs or alcohol. He said she died suddenly eight or nine years ago, and he did not think Carolyn was sick prior to her death. He testified Larry was still alive but suffered a stroke after he was "strung out" on drugs. Due to his condition, Larry was unable to testify.

Mr. Tools was unaware of whether Earnest was violent toward Delois when the Petitioner was young. He did not know why Delois and Earnest separated. Delois later remarried Willie Hall, with whom Mr. Tools believed Delois had a good relationship. Mr. Tools said Mr. Hall lived in a nursing home and was not in a condition that would allow him to testify. Mr. Tools did not want to see the Petitioner executed and believed life in prison would be best for the Petitioner and his family.

Joyce Rice, the Petitioner's sister, testified their parents were deceased. Joyce first said their parents "got along all right." She then stated their father accused their mother of cheating on him and argued with her on a daily basis. Their parents eventually separated and divorced.

Joyce said Pam was diagnosed with lupus and died in the 1970's when the Petitioner was fifteen or sixteen years old. She described Pam as a good person and intelligent. Pam wanted to attend college and be an accountant, but her illness prevented her from doing so. Pam and the Petitioner were close, and the Petitioner was good to her. The Petitioner found Pam when she died, which Joyce said affected the Petitioner.

Joyce testified Ricky was killed by someone who robbed him and beat him in the head with a stick. She and the Petitioner found his body in a pool. Carolyn died of cancer ten or eleven years prior to the post-conviction hearing. Joyce said all of their siblings were close.

Joyce recalled her father beating her with an extension cord when she was fourteen or fifteen years old because she was "courting a man" and missed curfew. He also slapped Pam on one occasion. The Petitioner did not witness the incident but was later made aware it.

Joyce said the Petitioner did not graduate high school and believed that he quit school in the eighth grade. She thought he was enrolled in special education classes. Joyce testified that the Petitioner and Tracie Rice used crack cocaine together and that she saw the Petitioner using crack cocaine on one occasion. She also testified the Petitioner would drink beer whenever he had money to purchase it. She recalled one occasion when the Petitioner was working for Goodwill in which he stopped by her house, drank a can of beer, and returned to work. Joyce said she loved the Petitioner and did not want him to die.

Andrew Folson, the Petitioner's first cousin, testified he first met the Petitioner when he was nine years old and the Petitioner was three or four years old. He, his mother, and three of his siblings moved from Mississippi and lived with the Petitioner, his parents, and his siblings. Mr. Folson's family lived with the Petitioner's family for approximately one year, and Mr. Folson continued to spend time with the Petitioner's family after Mr. Folson's family moved.

Mr. Folson noted that the Petitioner's sister Pam, died when the Petitioner was thirteen or fourteen years old. Mr. Folson said that the day that Pam graduated from high school, someone put something in her drink that "kind of messed her up." He was unaware that Pam had lupus. He said that the Petitioner and Pam were close and that he believed Pam's death affected the Petitioner. Mr. Folson recalled that when the Petitioner was eighteen or nineteen years old, his brother, Ricky, was found dead in a swimming pool. The Petitioner's sister, Carolyn, is also deceased, but Mr. Folson could not recall how or when she died.

Mr. Folson said the Petitioner began drinking alcohol when he was nine or ten years old. He and the Petitioner would "sneak in" and take their siblings' alcohol. Mr. Folson first testified he never saw the Petitioner intoxicated. He then testified that when he did see the Petitioner intoxicated, he believed "it kind of like altered his character somewhat." He stated the Petitioner behaved differently when he was drinking. Mr. Folson heard the Petitioner would become violent when drinking but never witnessed such violence. He said he, Larry, and Ricky also had alcohol problems.

Mr. Folson testified the Petitioner skipped school but was unaware of how often he was absent from school. He said that when he and the Petitioner skipped school they would "[p]robably go somewhere and go to some store and probably we would steal something and

give somebody something to buy some, something to drink or something of that nature." When truant officers caught them skipping school, they were suspended.

Mr. Folson recalled that the Petitioner's mother or an older sibling would care for the Petitioner and his other siblings during the day while his father was working. He said that while the Petitioner's mother "looked mean," he was unaware of her attitude toward her children. He believed the Petitioner was allowed to "just run wild." He said that while he thought the Petitioner's mother was aware of the Petitioner's drinking and skipping school, he could be wrong.

Mr. Folson stopped spending time with the Petitioner in the early 1980's. He had heard the Petitioner used cocaine but was unaware of whether the Petitioner developed a reputation as a drug user. He believed he had heard the Petitioner described as a "weekend addict."

Mr. Folson acknowledged that he has been in prison for a majority of his life. He was incarcerated in 2001 and at the time of the post-conviction hearing. He said no one contacted him in 2001 regarding his knowledge of the history of the Petitioner's family.

Don Legler, the Petitioner's supervisor at Goodwill, testified the Petitioner was employed as a truck driver at Goodwill from August 1999 until the end of May 2000. He described the Petitioner as nice, well dressed, and well mannered. Mr. Legler was satisfied with the Petitioner's job performance at first. The Petitioner, however, began coming to work late, leaving early, and deviating from his routes. He was terminated as a result.

Mr. Legler testified he suspected the Petitioner was drinking alcohol and driving while at work. He recalled smelling alcohol in the cab of the Petitioner's truck when he returned it before leaving for the day. Mr. Legler never confronted the Petitioner about the drinking as he was unsure whether the odor was coming from inside the cab or whether the alcohol was from the Petitioner or the handler who was also inside the truck. He said that if he had smelled alcohol on the Petitioner's breath or observed him in an intoxicated state, he would not have allowed the Petitioner to drive the Goodwill truck. Mr. Legler never smelled alcohol on the Petitioner's breath or observed in him an intoxicated state. Mr. Legler said other employees had reported instances in which the Petitioner deviated from his route and stopped at his home. These employees were concerned that the Petitioner had stopped at his home to use drugs or drink alcohol.

Dr. Pamela Auble, a clinical neuropsychologist, was admitted by the post-conviction court as an expert in the field of neuropsychology. Dr. Auble explained that a neuropsychologist typically develops and examines a person's social history and issues of

brain dysfunction. Such an examination requires interviews, reviews of records, and neuropsychological testing. She said a psychological evaluation does not generally examine brain dysfunction. While an I.Q. test may be administered during a psychological evaluation, specialized testing to evaluate memory and mental flexibility would not be conducted.

Dr. Abule noted Dr. Angelillo administered I.Q. tests and found the Petitioner's I.Q. to be 79, which was in the borderline range. The Petitioner also performed poorly in school, was enrolled in special education classes, and failed grades. She said this information indicated possible issues with the functioning of the Petitioner's brain requiring further investigation. She acknowledged that Dr. Angelillo administered an intelligence test and two personality tests, but she was unsure what records that he had reviewed. Dr. Auble said Dr. Angelillo apparently was never asked to integrate those records with his evaluation or testify to the effect of the events of the Petitioner's life. She also said that while Dr. Angelillo listed the events of the Petitioner's life during his testimony, he did not discuss those events in detail.

Dr. Auble met with the Petitioner on three occasions in November 2008 and spent approximately ten hours with him. She also reviewed school records, testimony from trial, court records, juvenile records, jail and prison records, the discovery materials, divorce records, employment records, records of evaluations conducted by Dr. Angelillo and Dr. Zager in 2001, Dr. Murray Smith's report, and records of interviews conducted by Inquisitor in 2001 and 2009.

Dr. Auble said that from her review of the Petitioner's school records and records of interviews of witnesses and her interview with the Petitioner, she believed the Petitioner's functioning had always been low. The Petitioner was administered the Kuhlam-Finch Test, a group-administered intelligence test, in the third grade, which resulted in an I.Q. score of 76. He was administered the Lorge Thorndike test, a group-administered intelligence test, in the fifth grade, which resulted in an I.Q. score of 77. Dr. Auble noted the Petitioner's achievement testing did not improve while he was advancing in grade levels. The Petitioner was also enrolled in special education classes and his attendance was poor. He was absent for thirty days and tardy fifteen days when in the third grade. Dr. Auble explained such absenteeism in younger grades showed a lack of supervision or investment in schooling by the parents. She referenced the interview with Mr. Folson in which he stated the Petitioner's mother did not seem to care whether her children attended school.

Dr. Auble said that the Petitioner was enrolled in school up to the ninth grade but that the last grade in which he actually passed was the sixth grade. He failed the seventh grade but was placed in the eighth grade. Dr. Auble noted the Petitioner "was only present thirty-eight days, changed schools, was only present two days, changed schools only present two

days." She believed one of the records indicated the Petitioner might have been in the ninth grade. While the Petitioner had stated he quit school in the tenth grade, Dr. Auble did not believe he was at that grade level. She explained that those who are not educated are usually poorly prepared for adult life and are inhibited in their ability to obtain employment. The Petitioner held many entry-level and temporary jobs but was unable to maintain employment for a long period of time.

Dr. Auble noted the Petitioner was the youngest of six children and lived in a one-bedroom house for the first eight years of his life. She said the Petitioner would not have received a large amount of individual attention from his parent because his parents would have been distracted with his five older siblings. The Petitioner's father was verbally abusive to everyone in the family and easily angered. His father's anger was generally directed toward the women, particularly the Petitioner's mother. The Petitioner informed Dr. Auble of episodes during which his father cut up clothing and purses and threatened people while holding a loaded gun. Dr. Auble said such violence would frighten a child and cause the child to be insecure. The Petitioner, his brother, one of his sisters, and his mother reported his father was violent toward Pam and knocked her out of her wheelchair. The Petitioner's sister reported that their father hit Pam on the face while she was lying on the couch, and the Petitioner was familiar with the incident. When Joyce was fifteen years old, their father beat her with an extension cord upon learning that she was dating.

Dr. Auble explained that violence in a household creates an atmosphere of tension and uncertainty. The children are always on edge because they are waiting for the next violent episode to occur. Dr. Auble noted research indicating the experience of always being in an anxious state changes a child's brain chemistry. She also noted sons who witness violence from their fathers will often exhibit such violent behavior when they are older. She said the Petitioner had a tendency to be violent toward women and "explodes" when angry.

Dr. Auble said the Petitioner's parents separated when he was eight years old. While the Petitioner maintained contact with his father, he did not see his father on a daily basis. His mother did not supervise the Petitioner and his siblings. Dr. Auble noted the Petitioner's problems at school began when he was in the third grade during the same time period in which his parents separated.

Dr. Auble testified the Petitioner was eight years old when Pam became sick and fourteen years old when she died. She reviewed Pam's medical records and noted she was diagnosed with lupus and degeneration of the cerebellum, which is a structure of the back of the brain relating to motor control. Pam was unable to walk and was confined to a wheelchair. As the disease progressed, she became unable to roll over or sit up for any length of time. Pam took prednisone for four years, resulting in an enlarged heart. The

Petitioner was alone with Pam in their home when she died. Pam told the Petitioner that she knew she was going to die and then went into the bathroom where she died. Their mother returned and was unable to enter the bathroom because Pam had fallen against the door. The Petitioner's brother had to enter the bathroom through a window. The Petitioner told Dr. Auble that he did not know how Pam's death had affected him and had not dealt with her death.

Dr. Auble said Pam was bright and wanted to attend college. Her maternal grandfather had agreed to pay her tuition. Pam, however, became ill after graduating high school and never recovered. Out of the six siblings, only Pam and Carolyn graduated high school.

Dr. Auble testified that in 1980 or 1981 when the Petitioner was sixteen years old, he was outside of a convenience store when he heard what he believed to be firecrackers. When he looked inside the store, he witnessed a robbery and murder. The Petitioner became frightened and ran. He later told police officers that he witnessed the murder and testified for the State at trial. The two defendants were convicted of first degree murder and received the death penalty.

Dr. Auble said many deaths occurred in the Petitioner's family beginning in the mid-1980s. His grandfather died in 1984; his father died of cancer in 1985; his brother, Ricky, died in 1986; and his grandmother died in 1986 or 1987. Dr. Auble believed the death of the Petitioner's father and brother were particularly difficult for him. She explained that the Petitioner had ambivalent feelings about his father and felt abandoned by him when his parents separated. Due to the ambivalent feelings, the Petitioner was unable to come to terms with his father's death and did not know how to grieve. The Petitioner's primary approach to grief or loss was to avoid thinking about it.

The Petitioner reported to Dr. Auble that Ricky came to his home at approximately 1:00 or 2:00 a.m. on the morning of his death to borrow a screwdriver. Ricky said he and his girlfriend were having relationship issues but did not want to discuss it further. Two hours later, someone came to the Petitioner's door and informed him that Ricky was in a swimming pool. The Petitioner ran to the swimming pool and saw Ricky dead and floating in the water. The Petitioner could not swim and called 911. By the time the ambulance arrived, Ricky was dead. Dr. Auble stated the police report of Ricky's death confirmed the Petitioner's version of the events. She acknowledged that members of the Petitioner's family seemed to believe Ricky was murdered or that his death was the result of foul play. Dr. Abule said the Petitioner did not know how to deal with the fact that Ricky died in front of him.

Dr. Auble testified the Petitioner and his family did not address illness, death, and tragedy but kept their feelings to themselves. She noted that according to a discharge summary in 1977, Pam was referred to a mental health center because she could not burden her family with the agony of her illness. Dr. Auble noted that Mr. Folson described the Petitioner as quieter than others in his family. She also noted that the Petitioner and his family members rarely showed emotion. When the Petitioner was drinking alcohol, however, he became angry. Dr. Auble said that the Petitioner's behavior deteriorated following Pam's death and that his grades began to suffer. In the 1980's, the Petitioner's drinking and drug usage increased, and he began using crack cocaine. Joyce and her boyfriend reported the Petitioner had used crack cocaine in their car. The Petitioner was unable to maintain long term employment. He worked at Goodwill Industries from 1999 to 2000 but was fired after he was caught drinking while on the job.

Dr. Auble noted a witness saw the Petitioner drinking a beer and purchasing drugs on June 18, 2000, the date of the victim's death. Dr. Murray Smith and Dr. Angelillo discussed the Petitioner drinking and using drugs that day. The Petitioner reported to Dr. Auble that he used crack cocaine, LSD, and alcohol on June 18.

Dr. Auble administered eighteen tests to the Petitioner, including testing for intelligence, memory, mental flexibility, achievement, motor skills, language, attention and concentration, adaptive functioning, malingering, and personality. Dr. Auble said that while Dr. Angelillo administered an I.Q. test and personality tests, the remaining tests that she administered were neuropsychological tests that Dr. Angelillo would not have been expected to know how to administer. She administered the Test of Memory Malingering and determined the Petitioner was not malingering. She also administered the Wechsler Adult Intelligence Scale, Fourth Edition and determined the Petitioner's full scale I.Q. to be 76. Dr. Auble said this score was consistent with the scores of testing administered by Dr. Angelillo and the school system.

Dr. Auble said those people who are not intelligent generally experience more difficulties in coping with life. She noted the Petitioner's intelligence was lower than the other members of his family as he was the only one who was enrolled in special education classes. Dr. Auble said the Petitioner's functional intelligence worsened when he was intoxicated. He was born into a family whose way to cope with problems was to "shut down." She described the Petitioner as someone who did not understand his emotions so that "he ends up like his father having emotional outbursts against women mostly. You know, his intelligence has limited his ability to cope with his world."

Dr. Auble noted that at the end of May 2000, the Petitioner was fired from his job at

Goodwill. She explained that as a result, he had more time to use drugs and drink alcohol, which further impaired his functioning. His wife left him in early June 2000. Dr. Auble did not believe the Petitioner was capable of processing or coping with this stressor. He continued to increase his intake of alcohol and crack cocaine. He had been arrested for assault and was on probation and in an anger management program as a result. Two days before the victim's death, the Petitioner learned that a former girlfriend with whom he was involved in a relationship for ten years had died.

Dr. Auble understood that the Petitioner and Tracie Rice married because they used crack cocaine together. She said Tracie was unstable and may have had a history of psychological treatment. Tracie and the Petitioner fought often. When the Petitioner ran out of money, Tracie would leave him and obtain crack cocaine elsewhere. Dr. Auble said Tracie's abandonment was difficult for the Petitioner.

Dr. Auble administered the Wechsler Memory Scale and determined the Petitioner's memory was below the first percentile for his age category. She said fewer than 1% of those with his full scale I.Q. would have a obtained such a low score. She also said that as a child, the Petitioner was unable to remember information told to him. His achievement tests did not improve as he advanced each grade level because he was not learning what other students learned during each year. As a result, the discrepancy between the information that the Petitioner learned and his grade level increased each year. Dr. Auble understood the Petitioner was enrolled in the GED program for several years while in prison but never obtained his GED. She believed the Petitioner was unable to obtain his GED because his memory was impaired.

Dr. Auble believed the Petitioner's problems with memory also affected his job performance. She noted that while employed at Goodwill, the Petitioner had difficulties maintaining his log and keeping track of his schedule. She believed the Petitioner's memory "is something that effects his functioning in his life and that cumulatively had an effect on where he was in the few weeks before this offense."

Dr. Auble also tested the Petitioner's ability to multi-task or plan and change behavior. The Petitioner's performance was average on the structured testing. He found open-ended questions to be more difficult. Dr. Auble said the results from the testing revealed the Petitioner was unable to adapt to change in open-ended situations. She explained the Petitioner was overwhelmed by the events that were occurring at the time of the offense and was unable to determine a rational solution to the problem. She said that as a result, the Petitioner "ends up in a situation where terrible and tragic things happen." Dr. Auble noted that the Petitioner had adapted well to a structured setting like prison and only had one write-

up while in prison.

Dr. Auble testified the Petitioner's drug and alcohol use also impaired his mental functioning and affected his ability to cope. She said he would have likely behaved in an impulsive manner with drug and alcohol use. As a result, he was more likely to engage in irrational behavior. Dr. Auble diagnosed the Petitioner with cognitive disorder not otherwise specified with particular deficits in verbal memory, reading, and spelling and some impairment in concentration and executive functioning.

On cross-examination, Dr. Auble testified she did not know whether the Petitioner's parents divorced or whether his father's death ended the marriage. The children continued to see their father after their parents separated. Dr. Auble acknowledged Joyce Rice had stated that the children were close to their father. The Petitioner said he had regular contact with his father but felt that his father was not there for him.

Dr. Auble explained that a person who is raised in a violent environment will sometimes address situations in a violent matter as the person grows older. The Petitioner admitted his violent behavior to Dr. Auble. The doctor saw the seeds of such behavior at an early age, and the behavior proceeded in the Petitioner's relationship with his wife.

Dr. Auble was unsure when the Petitioner began drinking alcohol and stated he could have begun at age eight, nine, eleven, or twelve. She identified the danger of using alcohol on a regular basis at an early age when the brain is forming. Dr. Auble believed the Petitioner was "reasonably" upfront with her about his alcohol and drug abuse.

Dr. Auble testified that when the Petitioner was confronted with an event such as a death in the family, he responded by drinking alcohol and ingesting drugs. He also had emotional outbursts, particularly when he was intoxicated. He was under the influence of drugs and alcohol on a regular basis around the time of the victim's death. Dr. Auble found that throughout the Petitioner's life, his explosive outbursts were generally directed against the women in his life.

Dr. Auble acknowledged that Dr. Angelillo discussed the Petitioner's explosive temper and personality characteristics and listed his social history. Dr. Auble said Dr. Angelillo was never asked from where the Petitioner's behavior came and why he behaved in such a matter. She did not know what information Dr. Angelillo reviewed for the Petitioner's social history. She acknowledged that Dr. Angelillo found that the Petitioner's daily functioning was characterized by severe dependency needs and that the Petitioner could

not function without the approval and acceptance of others. Dr. Auble agreed with Dr. Angelillo's finding that the Petitioner was likely to be very angry at those who he had become dependent upon as well as himself for being so dependent. Dr. Auble said, "Dr. Angelillo was never asked to say where did that come from, how did he get to be that way. Which is something that I think normally would be asked if you're an expert."

Dr. Auble testified that while the Petitioner was capable of learning, he learned at a much slower pace than others. She said the more complicated the information, the less likely that the Petitioner would have been able to remember it.

On redirect examination, Dr. Auble testified she did not discuss the case with Dr. Angelillo. She said the general psychological testing administered by Dr. Angelillo would have been the same testing that she would have administered had she been a general psychologist.

Dr. Murray Smith, a physician in Nashville, Tennessee, was admitted by the post-conviction court as an expert in addiction medicine. Dr. Smith testified he was asked to identify the effect the Petitioner's drug and alcohol use might have had on his behavior and decisions at the time of the offense on June 18, 2000. In evaluating the Petitioner, Dr. Smith relied upon Dr. Auble's report, Dr. Angelillo's report, the transcript of Dr. Angelillo's testimony at trial, and summaries of interviews of witnesses conducted by Inquisitor in 2001 and 2009. Dr. Smith also met with the Petitioner on November 12, 2009, at the Riverbend Maximum Security Prison in Nashville. He acknowledged that blood testing of the Petitioner at the time of the offense was not available.

Dr. Smith testified family and social history is important in his analysis as past events influence present and future behavior. He noted the Petitioner and his family lived in a small, crowded home. The Petitioner's father exhibited violent behavior toward his mother and two sisters. The Petitioner witnessed his father strike his mother on multiple occasions. His father struck his sister, Pam, who had lupus and neurologic complications from lupus that confined her to a wheelchair. His father also beat another sister with an electric cord.

Dr. Smith noted the Petitioner's parents divorced when he was eight years old. Pam died of complications from lupus. Dr. Smith said the Petitioner was close to Pam and was with her when she died. The Petitioner felt responsible for her death. The Petitioner's brother, Ricky, drowned. Dr. Smith said the Petitioner was taken to the swimming pool, saw Ricky lying in the bottom of the pool, and felt helpless.

Dr. Smith testified the Petitioner informed him that he began drinking alcohol when

he was approximately eleven years old and would obtain it from friends and older relatives. He also reported to smoking marijuana and cigarettes during that same time period. He told Dr. Smith that by the age of fifteen or sixteen, he was smoking marijuana and cigarettes and drinking alcohol daily. Dr. Smith noted this time period correlated with the Petitioner's failing the seventh grade twice and his truancy. The Petitioner informed the doctor that at the age of eighteen, he substituted the marijuana with crack cocaine while continuing to smoke cigarettes and drink alcohol. The Petitioner estimated drinking eight to twelve beers most evenings. He increased the amount of alcohol that he consumed on weekends.

Dr. Smith testified he believed the Petitioner was addicted to alcohol, crack cocaine, and tobacco. He described crack cocaine as one of the most addictive substances. He said the drug caused a "sudden rush of tremendous pleasure and a feeling of strength and being superman or superwoman." The feeling lasts from thirty minutes to one hour. Once that feeling is over, the person begins to crave that feeling again. Alcohol, however, results in a calming effect and blocks the receptors that cause anxiousness.

Dr. Smith noted that Dr. Angelillo administered personality tests and an I.Q. test to the Petitioner. Dr. Angelillo concluded the Petitioner exhibited anxiety, depression, some degree of paranoia, difficulty with interpersonal relationships, diminished intelligence, and some degree of explosiveness in terms of violence. Dr. Smith also noted that Dr. Auble administered more extensive testing to define brain functioning as it related to intelligence, memory, and his ability to address complex problems that arose in daily living. Dr. Smith said both doctors concluded that the Petitioner "had significant dysfunction not only in terms of . . . the decreased intelligence, but also decrease in terms of how well he could handle problems, understand problems. How well he could organize a plan about how to handle things. How well he could understand what was happening." Dr. Smith acknowledged that he listed the Petitioner's dysfunctions in his report as anxiety, depression, and paranoia as those were the dysfunctions that Dr. Angelillo found in his testing.

Dr. Smith testified dysfunctions of the brain and some personality characteristics worsen with alcohol and crack cocaine use. Alcohol increases impulsivity, decreases inhibitions and comprehension, and shortens the fuse for violence. Cocaine diminishes the blood flow to the brain thereby diminishing brain function. Dr. Smith explained that cocaine also affects a person's ability to understand a problem, devise a plan to address the problem, and implement or change the plan. He described the combination of alcohol and crack cocaine on brain function as "devastating" and said the combination worsened the Petitioner's existing dysfunctions.

Dr. Smith noted the stressors in the Petitioner's life had increased at the time of the offense. On May 24, 2000, he lost his job at Goodwill Industries where he was being paid

$12,000 to $13,000 per year. On June 6, his wife left him. During the weekend of June 17, the Petitioner learned that Vernetta Houston, with whom he had a ten-year relationship, had died of liver disease. Because the Petitioner was no longer employed and had been upset, he increased his daily intake of alcohol and drugs beginning at approximately the first of June 2000. He reported to Dr. Smith that he would go to sleep at 2:00 or 3:00 a.m. and waken at 6:00 a.m. When the Petitioner did sleep, it was a "restless worried type sleep." The Petitioner told the doctor that on June 18, at 10:00 or 11:00 a.m., he went to his drug dealer's home where he drank alcohol and smoked crack cocaine. He also tried LSD, a hallucinogen for the first time by dipping a cigarette into the LSD solution and smoking it. The Petitioner also told Dr. Smith that from June 18 to June 25, he used alcohol and crack cocaine on a daily basis.

Dr. Smith stated the Petitioner told him that on Sunday, June 25, at midday, police officers arrested him, drove him to an area across the street from where the victim's body was discovered, and parked there for a period of time. He reported that while at the police station, officers constantly harassed and questioned him and did not allow him to rest. Smith testified that because the Petitioner was using alcohol and crack cocaine daily, he would begin to have withdrawal symptoms within twelve to eighteen hours after his last use of alcohol and cocaine. He said the treatment for withdrawal included little noise, dim lighting, and rest, none of which the Petitioner was afforded at the police station.

Dr. Smith testified the Petitioner was emotionally upset on June 18, 2000, due to the events that had been occurring in his life. He did not possess the tools to address those stressors. Rather, he reacted by continuing to ingest alcohol and cocaine.

On cross-examination, Dr. Smith testified the Petitioner was calm and polite during their meeting. The doctor recognized the Petitioner suffered from memory problems in attempting to recall dates and occurrences. Otherwise, the Petitioner attempted to answer all questions to the best of his ability. Dr. Smith acknowledged that Dr. Angelillo found the Petitioner to be very angry, somewhat sullen, mistrustful, and generally self-indulgent. Dr. Smith said the Petitioner was more polite and cooperative with him. Dr. Smith did not administer tests but considered the results and interpretations of testing administered by others in his diagnosis. He acknowledged that Dr. Angelillo found that the Petitioner had a disregard for authoritative figures and a tendency to deny responsibility and blame others for his problems. He also acknowledged that "every addict is a con artist."

Dr. Smith noted Dr. Angelillo found the Petitioner used a large amount of drugs and alcohol. He said the fact that the Petitioner was using drugs appeared throughout the record. He acknowledged that he obtained the information regarding the amount and frequency of the drug use from the Petitioner. The Petitioner reported he obtained money to purchase

cocaine, alcohol, and cigarettes during the last weeks in June 2000 when he was unemployed by "[h]ustling." He also reported three to five people with whom he shared cocaine and that his dealer would also "front" him drugs.

Dr. Smith concluded in his report that "because of the effects of alcohol, cocaine, LSD and sleep deprivation on the psychological and cognitive dysfunction of Mr. Rice's brain, he would have difficulty understanding the circumstances and conforming his behavior in an appropriate manner on 18 June, 2000." Dr. Smith said the Petitioner never discussed the victim's death or his involvement.

Dr. Gregory DeClue, a forensic psychologist, was admitted by the post-conviction court as an expert in forensic psychology. Dr. DeClue focused upon the psychology of interrogations and confessions and evaluated the Petitioner with regard to his statements to police. He reviewed the reports of Dr. Angelillo, Dr. Auble, and Dr. Murray Smith and the videotape of the walkthrough of the crime scene with the Petitioner and the police officers. He also interviewed the Petitioner and administered tests. He said the Petitioner appeared calm and relaxed during the interview.

Dr. DeClue did not administer intelligence testing but relied on testing previously administered by others. Dr. Auble assessed the Petitioner in 2008 and determined his I.Q. was 76. In 2001, Dr. Angelillo determined the Petitioner's I.Q. was 79. The Petitioner's school records indicated two other scores in the 70s. Dr. DeClue noted from the Petitioner's childhood to his adult years, he had an I.Q. in the borderline range.

Dr. DeClue administered the Woodcock-Johnson test, a battery of tests that address reading and listening comprehension. He found the Petitioner's reading skills were at about the third grade level. His oral language, oral expression, and listening comprehension skills were at the fourth grade level. His memory tests scores fell within the kindergarten to first grade level.

Dr. DeClue said he analyzed the Petitioner's statement to police to determine whether he knowingly, voluntarily, and intelligently waived his Miranda rights and whether his statement was voluntary and reliable. In making these determinations, Dr. DeClue utilized the Instrument for Assessing, Understanding, and Appreciation of Miranda Rights, which included four subtests. With regard to the first subtest, the Comprehension of Miranda Rights, Dr. DeClue presented a set of rights to the Petitioner and asked him to explain them in his own words. The Petitioner was able to see the words, and the doctor read the words to him. Dr. DeClue said the Petitioner received a score of six out of a possible eight points. He explained the Petitioner demonstrated some understanding of the Miranda rights and was able to paraphrase the rights fairly well.

In the second subtest, the Comprehension of <u>Miranda</u> Rights Recognition, Dr. DeClue gave the Petitioner two sentences for each of the rights and asked him whether the sentences were similar or different. He said that while the sentences appeared to state the same thing, the meaning of each sentence was different. The Petitioner received a score of six out of twelve.

In the third subtest, the Comprehension of <u>Miranda</u> Vocabulary, Dr. DeClue asked the Petitioner to define words included in the <u>Miranda</u> rights. The Petitioner was able to correctly define "attorney," "entitled," and "right." He understood "consult" to mean "something about talking" but was unable to be more specific. He was unable to correctly define "interrogation" and "appoint." The Petitioner received a score of seven out of twelve.

In the fourth subtest, the Function of Rights and Interrogation, Dr. DeClue provided the Petitioner with different scenarios and questions to determine whether he understood the rights and could put them in context. The Petitioner received a score of fourteen out of thirty. The doctor said that while the Petitioner had some understanding of the issues, he did not have a good understanding of some of the important issues. For example, when questioned about a defendant who is consulting with his attorney, the Petitioner stated he believed the defendant should remain silent.

Dr. DeClue testified that according to the results of these tests, the Petitioner was able to do "somewhat good" in defining the <u>Miranda</u> rights in his own words. The Petitioner missed important distinctions in recognizing the differences in the rights. The doctor said the Petitioner "did not show very good ability" in applying the rights or putting them into practice. Dr. DeClue acknowledged that there could have been some changes in the Petitioner's understanding in the rights between the time he was questioned by law enforcement officers in 2000 and the testing in 2010. He said he saw no evidence suggesting the Petitioner would have had a better understanding of his rights in 2000. Rather, Dr. DeClue noted the Petitioner made comments suggesting that he knew more about his rights after the trial was completed.

Dr. DeClue also administered the Gudjonsson Suggestibility Scale (GSS), a test of interrogative suggestibility. He read a fairly long paragraph to the Petitioner and asked him to state what he remembered. Dr. DeClue said that on average, a person will recall approximately twenty different details but that the Petitioner only recalled four and one-half details. The doctor believed the results were consistent with the results of other testing that he administered and demonstrated the Petitioner's memory for details was quite low. As part of the test, the doctor was supposed to wait thirty minutes and then ask the Petitioner to again repeat as many details as he recalled. Dr. DeClue explained that when a person like the Petitioner scores very low on the immediate recall, it is recommended that this portion of the

-43-

test not be administered. He believed the Petitioner had a very low I.Q., a learning disability, and serious memory problems. He said a person with those issues is not likely to recall any portion of the paragraph after thirty minutes.

Dr. DeClue testified the next portion of the GSS required that he ask the Petitioner a series of questions, many of which were leading to determine whether he would yield to subtle interpersonal pressure from the leading questions to tell the story that the doctor wanted him to tell even if it did not match the story that he heard. The doctor said the Petitioner's lack of memory for details set him up to be suggestible. The Petitioner yielded to the leading questions and gave a wrong answer more than twice as often as the average person. Dr. DeClue then told the Petitioner that he made a number of errors and instructed him to be more accurate. He explained he was testing whether the Petitioner would shift his answers in response to the pressure. The Petitioner changed his answers three times, which was as often as the average person. Dr. DeClue said that the Petitioner's total score was thirteen and that the average score was seven and one-half. The score revealed the Petitioner was significantly above average in the amount of suggestibility that he showed. The doctor explained, "So he's–particularly if he doesn't know the answer and you ask the question in a way that–he'll try to answer it the way the person wants to hear it."

Dr. DeClue noted the Petitioner's reading skills, oral language skills, and memory skills were very low. He said that as a result, it was "very unlikely that he would be able to understand and appreciate any detailed communication without special accommodations, and it would decrease his ability to understand and appreciate the Miranda warnings." Dr. DeClue stated the Petitioner cannot read the Miranda form unless the form is simple. He believed that the Petitioner would not be able to understand the rights when presented orally because his listening skills were only slightly better than his reading skills. He stated the Petitioner's suggestibility would make him more vulnerable to police pressure than the average person.

Dr. DeClue also assessed whether the Petitioner's waiver of his Miranda rights was knowing, intelligent, and voluntary. He noted that in this case, there was no clear direct record showing the Petitioner understood his Miranda rights because the interrogation was not recorded. He also noted that the Petitioner's ability to read was at a third grade level and that his ability to understand what he was told was at a fourth grade level. Dr. DeClue reviewed the transcript of the officer's testimony regarding the interrogation and the Miranda form that the Petitioner initialed. He determined that the form was presented at a reading level grade of 8.4 and that one portion of the form was at a 12.0 grade reading level. Dr. DeClue testified that as a result, the Petitioner was able to read some of the words but was unable to understand them. Reading the form to the Petitioner only made it slightly easier for him to understand. Dr. DeClue said the police officers did not employ a procedure to

show that the Petitioner understood his rights. He explained that to determine whether the Petitioner understood his rights, the officers would need to instruct the Petitioner to explain those rights in his own words.

Dr. DeClue also determined whether the Petitioner's statement to the police was voluntary. He noted that the Petitioner did not go to the police and confess but that the police went to him. The Petitioner initially denied any involvement in the victim's death. The doctor said the Petitioner changed his statement in response to questioning and pressure by the police. He acknowledged that because the interrogation was not recorded, there was no accurate and thorough record of how the police officers persuaded the Petitioner to change his statement. Dr. DeClue said that while he believed the Petitioner's statement took two to three hours to record, he could not offer such an opinion to a reasonable degree of certainty. The Petitioner informed Dr. DeClue that the process of taking his written statement did not involve a detective asking questions, the Petitioner answering them, and someone typing the questions and answers. Rather, the Petitioner maintained that he and the officer were involved in a continuous conversation and that only a portion of the conversation was typed.

Dr. DeClue testified that during the walkthrough of the crime scene, the officers did not allow the Petitioner to lead them. Rather, when the Petitioner pointed in one direction in response to a question of where the stabbing occurred, the officer immediately pointed in a different direction. Dr. DeClue noted the officer supposedly knew where the victim's remains were discovered. He further noted that the Petitioner appeared to be unsure and that the officer led him in the direction in which the officer had pointed. He said the officers then presented the location to the Petitioner as if he discovered it, which the doctor believed to be coercive.

Dr. DeClue also considered the reliability of the Petitioner's statement. He testified that because the victim's remains had been discovered at the time the Petitioner was interviewed, the officers had evidence regarding the location of the victim's body and the condition of the body and possibly some evidence regarding the victim's cause of death. The doctor noted the Petitioner did not reveal any details of the crime scene during the walkthrough that were not told to him by the officers. The Petitioner told the doctor that the officer informed him that Mr. Evans said the killing occurred "in a particular nonbuilding area." The Petitioner maintained the officers told him during the course of the interrogation who the victim was and where she had been found. Dr. DeClue said that while the Petitioner identified where the co-defendant entered the area and where certain events occurred, "[n]one of that really actually nails down the known facts." For example, the Petitioner did not produce the murder weapon. The doctor said the Petitioner walked around in the woods, pointed in different directions, and discussed matters that did not "particularly nail down" any independently verified evidence.

-45-

Dr. DeClue said there was no evidence that the Petitioner spontaneously confessed to any involvement in the offense. He acknowledged he did not have full knowledge of the events leading the Petitioner to make incriminating statements because the interrogation was not recorded. He understood that the police informed the Petitioner that the victim was sexually assaulted and that either his DNA had been found or would be tested. The doctor said his understanding of the police officers' testimony was that the Petitioner then informed them of his sexual activity with the victim in the kitchen which would have been considered voluntary but for her age.

Dr. DeClue noted a reliable method to obtain a confession is to withhold details of the crime from the suspect so that if the suspect subsequently confesses, he can show guilty knowledge by providing details that had not been shared with him by the police. The officers, however, shared with the Petitioner details about the location of the killing, the identity of the victim, and her cause of death. The Petitioner informed the doctor that the officers read Mr. Evans' statement to him. Dr. DeClue said he did not know how many details the officers told the Petitioner or means by which the details were shared. He did not find evidence of additional details that the Petitioner provided to the police demonstrating guilty knowledge. Dr. DeClue explained the Petitioner contradicted himself in his statement, changed his story, and never produced a statement accounting for the crime scene evidence that made sense. Although the Petitioner said the victim was stabbed in the head, he did not describe in detail the injuries illustrated in the autopsy report. He further noted that in his statement, the Petitioner said the co-defendant stabbed the victim in the head, neck, and chest, but that during the walkthrough, he only stated the co-defendant stabbed the victim in the head.

Dr. DeClue summarized his opinions as follows: The Petitioner initially denied any involvement in the victim's death. Under continuing pressure from the police "throughout the wee hours of the morning," the Petitioner gave contradictory statements. After "so called waiving rights that he could not understand," the Petitioner signed a statement that he could not read. He eventually participated in a videotaped walkthrough of the crime scene that did not lead to real tangible proof of guilt, such as finding a murder weapon or other physical evidence or taking the police to the exact spot where the victim's remains were discovered. During the walkthrough, the Petitioner did not detail wounds that matched those described in the autopsy report.

On cross-examination, Dr. DeClue testified he interviewed the Petitioner for two and one-half hours the day before he testified at the post-conviction hearing. The interview process consisted of an introduction and a discussion of the circumstances and the testing procedures. The doctor then questioned the Petitioner about the facts and tested him. Dr. DeClue estimated that the testing took approximately 80% of the time and that the

introduction and interview took approximately 20% of the time. He said that while the Petitioner never told him that he killed the victim, he had informed the Petitioner that he was not assessing his guilt or innocence.

Dr. DeClue acknowledged that in the Petitioner's written statement, he denied killing the victim and said the co-defendant killed her. The Petitioner said the co-defendant killed the victim because he did not like how the Petitioner's wife had been treating the Petitioner. Dr. DeClue was also aware that the co-defendant gave a statement of admission.

Dr. DeClue testified that while the Petitioner told the police that he understood his Miranda rights, he did not believe the Petitioner did so. Rather, he believed the Petitioner showed significant deficits in his understanding of the rights. The doctor said that while he asked the Petitioner about his drug use, he did not focus on it "very much."

Dr. DeClue said that while the fact that he was determining the Petitioner's understanding of his Miranda rights ten years ago was a disadvantage, he did not believe it to be a tremendous disadvantage. He explained that forensic psychologists routinely examine past events in attempting to reconstruct a defendant's mental state. He also said the lack of a recording and not the passage of time made reconstruction in this case more difficult.

## POST-CONVICTION COURT'S FINDINGS

Following the evidentiary hearing, the post-conviction court entered an order denying the Petitioner relief regarding both the guilt and penalty phases of the trial. The court rejected the Petitioner's claim that trial counsel were ineffective in failing to challenge the testimony of the forensic pathologist regarding the probability that the victim suffered bruising or injury to her vagina. The court noted evidence was presented at trial that there was no tissue left in the victim's pelvic region and that her underwear was found around her ankles. The Petitioner told officers that he saw the victim pull her underwear down when confronted by Mario and believed she did so because she probably thought that she would be raped. The court stated that when the Petitioner was asked for a DNA sample, he volunteered that he had consensual sex with the victim, even though another witness who was present during the time frame, refuted the Petitioner's statement. The court concluded the allegation failed for lack of a showing of prejudice.

The court rejected each of the Petitioner's claims regarding trial counsel failure to retain and present testimony from additional expert witnesses. The court reviewed evidence presented during the post-conviction hearing regarding the difficulties that trial counsel experienced in persuading the trial court to approve funds for expert assistance. The court observed that "[i]t is evident from [Lead Counsel's] testimony that he clearly knew what he

was doing, had been in this position several times before in capital trials, and had obtained everything he needed as soon as practicable." The post-conviction court found Lead Counsel would not have been able to establish particularized need at that time to obtain the funds for the additional experts. Dr. Angelillo did not recommend that the Petitioner be further examined by a neuropsychologist or an addiction specialist, and trial counsel had no reason to request funding for these experts. The Petitioner had no history of head injury, strokes, or seizures.

The court found that Dr. Angelillo "did an excellent job of describing the medical and psychological condition of the Petitioner during both the guilt and sentencing phase of his trial, and getting those facts before the jury for their consideration." The post-conviction court also found the testimonies of Dr. Auble and Dr. Murray Smith did not add "much, if anything," to the basic facts surrounding the Petitioner's drug use and low I.Q. According to the court, although Dr. Auble conducted additional testing, "everything mitigating about the Petitioner's mental condition, mental processing and IQ at the time of the offense and the trial had essentially already been offered at trial by Dr. Angelillo." The court described Dr. Auble's report and testimony as "largely technical" and said that the majority of Dr. Auble's report related to the Petitioner's social history and the results of tests that would have been obscure to the average juror. With regard to Dr. Auble's testimony, the post-conviction court also stated:

> As this court was listening to her testimony, with all due respect to Dr. Auble and her legitimate expertise, it was struck with how tedious and impersonal this testimony would feel to the average juror. It is not "compelling" mitigation. Dr. Angelillo's testimony, even when only read from the cold, printed page, seemed much more mitigating and more directly related to the character, situation and plight of the Petitioner, seemingly much more effective in helping the jury to find "any aspect of the Petitioner's character or record, or any aspect of the circumstances of the offense favorable to the Petitioner which is supported by the evidence." T.P.I.–Crim. 7.04(b) (the "catchall" mitigating circumstance).

While acknowledging that Dr. Auble concluded that the Petitioner had memory deficits, the court stated such deficits "would not readily adapt itself, in the thought processes of the average juror, into an explanation of why a 35 year old man would lure his 13 year-old step-daughter into the woods so that she could be raped, killed and her body left to decompose."

The court found that while Dr. Auble testified to other factors, these factors were not mitigating. No other witness testified that the Petitioner was exposed to any violence by his father. Moreover, no other witnesses testified to the Petitioner's claims to Dr. Auble that his

father cut up clothing or purses and threatened people with unloaded guns. The court further found that the mitigating evidence that was available but not presented was "slight" and "hardly mitigating." Acknowledging that the Tennessee Supreme Court held that consideration of the prior violent felony aggravating circumstance in Tennessee Code Annotated section 39-13-204(i)(2) was improper, the post-conviction court concluded that the other two aggravating circumstances were so strong as to outweigh any additional mitigating evidence. The court observed that some of the evidence in Dr. Auble's report regarding the substance abuse and the Petitioner's prior violence against women would have had a negative effect on his case.

The post-conviction court rejected the Petitioner's claim that trial counsel were ineffective in failing to investigate whether his statements to the police were influenced by crack cocaine withdrawal, threats, lack of sleep, neurological problems, or coercion. The court noted Dr. Murray Smith's testimony was based upon the assumption that the Petitioner was using drugs at the time, was sleep deprived, and was under the influence. There was no independent proof that the Petitioner was sleep-deprived or used drugs that day. The court found that Dr. Smith's testimony would have been admissible only in the penalty phase of the trial and that no proof that would have been admissible at the suppression hearing was presented indicating that crack cocaine withdrawal, threats, lack of sleep, neurological problems, or coercion influenced the Petitioner's statements to the police. The Petitioner did not testify at the suppression hearing, the trial, or his post-conviction hearings regarding any heavy drug use or sleep deprivation. The Petitioner never mentioned drug or alcohol use in his statements to the police. The court observed that the opinions of Dr. Auble, Dr. Smith, and Dr. DeClue were based upon their interviews with the Petitioner, "given for purposes of litigation years after the suppression hearing and trial, but shortly before their testimony at the hearing." The post-conviction court concluded that trial counsel were not deficient in this regard and that any deficiency did not result in prejudice.

With regard to Dr. DeClue, the post-conviction court observed that because the waiver of the Petitioner's rights and his written statement were not audio or video recorded, the doctor could not opine whether the Petitioner understood his rights and gave a valid waiver of those rights. He also could not opine whether the contents of the Petitioner's statement were the result of suggestion by the police. The court noted Dr. DeClue never opined that the Petitioner's written and videotaped walkthrough were false. Rather, he could only testify that due to the lack of a recording of the written statement and waiver of rights, he could never rule out that they were false. The court also noted that Dr. DeClue never asked the Petitioner whether the confessions were false and took steps to ensure that the Petitioner never volunteered such information. The post-conviction court found it unusual that Dr. DeClue admitted that in attempting to determine the Petitioner's mental state during the time of the confessions, he never asked the Petitioner whether he ever used drugs, let alone during

-49-

the time of the offense or around the time in which he made the statements to police. The court observed "[i]t seems this would be something an examiner would want to know in deciding whether or not rights were understood and voluntarily waived." The court noted Officer Clark's testimony at trial that the Petitioner was read his rights, understood his rights, and voluntarily waived them.

> The post-conviction court also watched the "walk-through" video and stated, it was immediately obvious to this court and would have been to any juror watching it, even after hearing Dr. DeClue's testimony about false confessions, that the comments made by the Petitioner on the video were voluntary and not made because suggested by Sgt. Fitzpatrick. He constantly corrected the officer, disagreed with him ("No, we went through here." "Not that I know of. No, sir."), answered questions in the negative ("Was she wearing a radio head set at the time?" "No."), pointing out landmarks without being asked, after several seconds of walking without speech ("Mario met us down here." "All three of us stopped right here.") and was very alert and cooperative. He displayed no memory problems, and volunteered much detail without being asked ("I remember I went down this valley behind this trench" (pointing)).

The post-conviction court rejected the Petitioner's claim that trial counsel failed to present a case for life during the penalty phase of the trial. The court noted that Mr. Folson disagreed with post-conviction counsel during much of the direct examination or stated that he had no knowledge. Mr. Folson recalled little and had to be prompted and examined through leading questions. The post-conviction court found Mr. Folson's testimony was not mitigating and painted a picture of the Petitioner as a child who was constantly getting intoxicated and skipping school. The court further found that because Mr. Folson was sent to prison several years prior to the victim's murder, he could not testify regarding the events, character, and actions of the Petitioner at the time of the murder. The post-conviction court also rejected the Petitioner's claim that trial counsel were ineffective in failing to present Mr. Legler as a witness, finding that Mr. Legler's testimony was not mitigating.

The post-conviction court found trial counsel were not ineffective in failing to present the testimony of Brandy and Monica Downey. The court characterized Brandy's testimony as a "struggle" and noted that when asked repeated leading questions, Brandy often disagreed with post-conviction counsel who was attempting to lead her into favorable testimony for the Petitioner. The post-conviction court found the testimonies of Brandy and Monica would not have been helpful to the Petitioner in the guilt or penalty phases of the trial and would have strengthened the Petitioner's connection with the victim as the last person to see her alive.

The post-conviction court examined Joyce Rice's testimony at the post-conviction

hearing and found that the same testimony regarding the Petitioner's family and their deaths was presented during his trial. The court noted Joyce's testimony that her father beat her with an extension cord and slapped Pam would have been inadmissible as it was not mitigating evidence and was not relevant because the Petitioner did not witness the acts. The court also noted Joyce's testimony about the Petitioner's drug use with his wife would not have been mitigating.

The post-conviction court also examined the testimony of Mr. Tools and found that much of his testimony would have been damaging to the Petitioner. The court further found that the majority of the testimony that was not damaging was introduced at trial through other witnesses. According to the court, "[d]espite the best efforts of the Petitioner's post-conviction counsel, they also failed to 'humanize' the Petitioner by presenting detailed evidence of his background and the life he had led prior to the crimes."

## ANALYSIS

The Petitioner maintains trial counsel were ineffective in both the penalty and guilt phases of the trial. The Petitioner's post-conviction petition is governed by the Post-Conviction Procedure Act. See T.C.A.. §§ 40-30-101 to -122. To obtain post-conviction relief, the Petitioner must show that his conviction or sentence is void or voidable because of the abridgement of a constitutional right. See T.C.A. § 40-30-103. The Petitioner must establish the factual allegations contained in his petition by clear and convincing evidence. See T.C.A. § 40-30-110(2)(f).

Once the post-conviction court has ruled upon a petition, its findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Wallace v. State, 121 S.W.3d 652, 656 (Tenn. 2003); State v. Nichols, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). This Court could not may reweigh or reevaluate the evidence or substitute its inference for those drawn by the post-conviction court. Nichols, 90 S.W.3d at 586. Questions concerning the credibility of witnesses and the weight to be given their testimony are for resolution by the post-conviction court. Id. (citing Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997)). It is, therefore, the burden of the Petitioner to show that the evidence preponderated against those findings. Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978).

Notwithstanding, determinations of whether counsel provided a defendant constitutionally deficient assistance present mixed questions of law and fact. Wallace, 121 S.W.3d at 656; Nichols, 90 S.W.3d at 586. As such, the findings of fact are reviewed under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. See Fields v. State, 40 S.W.3d 450, 458

(Tenn. 2001) (citations omitted).  In clarifying the standard, our supreme court explained that the standard for reviewing the factual findings of a trial court has always been in accordance with the requirements of the Tennessee Rules of Appellate Procedure, specifically Rule 13(d).  Fields, 40 S.W.3d at 456.

In pertinent part, the Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.  This right to counsel is "'so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the States by the Fourteenth Amendment.'" Gideon v. Wainwright, 372 U.S. 335, 340 (1963) (quoting Betts v. Brady, 316 U.S. 455, 465 (1942)).  Inherent in the right to counsel is the right to the effective assistance of counsel.  Cuyler v. Sullivan, 446 U.S. 335, 344 (1980).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  Strickland v. Washington, 466 U.S. 668, 686 (1984).

The United States Supreme Court adopted a two-prong test to evaluate a claim of ineffectiveness:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland, 466 U.S. at 687.  The performance prong of the Strickland test requires a showing that counsel's representation fell below an objective standard of reasonableness, or "outside the wide range of professionally competent assistance."  Id. at 690.  "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'"  Combs v. Coyle, 205 F.3d 269, 278 (6th Cir. 2000) (quoting Strickland, 466 U.S. at 689).

Upon reviewing claims of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).  Additionally, courts

should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Finally, we note that criminal defendants are "not entitled to perfect representation, only constitutionally adequate representation." Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794 (1987) (quoting United States v. Cronic, 466 U.S. 648, 655 n.38 (1984)). Notwithstanding, we recognize that "[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." Id. at 785.

If the Petitioner shows that counsel's representation fell below a reasonable standard, then he must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. The reasonable probability standard "requires a 'substantial,' not just 'conceivable,' likelihood of a different result. Cullen v. Pinholster, 131 S.Ct. 1388, 1403 (2011). In evaluating whether a Petitioner satisfied the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993) (citing Strickland, 466 U.S. at 687). In other words, "a Petitioner must establish that the deficiency of counsel was of such a degree that it deprived the [Petitioner] of a fair trial and called into question the reliability of the outcome." Nichols, 90 S.W.3d at 587. That is, "the evidence stemming from the failure to prepare a sound defense or [to] present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in an acquittal." State v. Zimmerman, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in Strickland." Id.

## I. GUILT PHASE

The Petitioner asserts trial counsel were ineffective in the guilt phase of the trial in failing to (1) investigate the mental health issues related to his confession; (2) challenge the forensic pathologist's testimony regarding injury in the victim's vaginal area; and (3) object to certain jury instructions.

### A. Failure to Investigate Mental Health Issues Related to Confession

The Petitioner argues that the evidence presented at the post-conviction hearing establishes that trial counsel's failure to investigate the mental health issues related to the Petitioner's confession violated his right to effective assistance of counsel. According to the

Petitioner, Dr. DeClue's testimony, in conjunction with the testimonies of Dr. Auble and Dr. Murray Smith, undermined the credibility of the Petitioner's statement to the police. The State contends that the evidence demonstrates that trial counsel were not deficient and that any deficiency did not result in prejudice. We agree with the State.

We note that at the post-conviction hearing, the Petitioner argued that trial counsel should have presented testimony of mental health experts both in a suppression hearing challenging the statements and at trial. On appeal, however, the Petitioner only argues that the evidence should have been presented at trial.

The post-conviction court found trial counsel would have been unable to show a particularized need for additional mental health experts and an addiction specialist and that as a result, the trial court would have denied any request for funding to retain these experts. See State v. Barnett, 909 S.W.2d 423, 426-28 (Tenn. 1995). The Tennessee Supreme Court has held that "while a State need not provide an indigent defendant with all the assistance his wealthier counterpart might buy . . . fundamental fairness requires a State to provide an indigent defendant with the 'basic tools for an adequate defense on appeal.'" Id. at 426 (quoting Ake v. Oklahoma, 470 U.S. 68, 66 (1985)). The trial court's obligation to afford an indigent defendant with the benefit of expert assistance does not arise unless the defendant makes a threshold showing of a "particularized need" for the expert assistance. See Tenn. Sup. Ct. R. 13, § 5(c)(1); Barnett, 909 S.W.2d at 430-31. Particularized need is established:

> When a defendant shows by reference to the particular facts and circumstances that the requested services relate to a matter that, considering the inculpatory evidence, is likely to be a significant issue in the defense at trial and that the requested services are necessary to protect the defendant's right to a fair trial.

Tenn. Sup. Ct. R. 13, § 5(c)(2).

Particularized need cannot be established and the trial court should deny requests for funding when the motion for funding includes only:

(A)     undeveloped or conclusory assertions that such services would be beneficial;

(B)     assertions establishing only the mere hope or suspicion that favorable evidence may be obtained;

(C)     information indicating that the requested services relate to factual issues or matters within the province or understanding of the jury; or

(D)     information indicating that the requested services fall within the capability and expertise of appointed counsel.

Id. at (c)(4). Unsupported assertions that an expert is necessary to counter proof offered by the State is not sufficient to establish particularized need. Barnett, 909 S.W.2d at 431. The defendant must reference facts and circumstances of the particular case and demonstrate that the appointment of the expert is necessary to ensure a fair trial. Id. The issue of whether a defendant has made the threshold showing is to be determined on a case-by-case basis. Id.

Trial counsel obtained approval from the trial court of funds to retain Dr. Angelillo, a clinical psychologist, to evaluate the Petitioner. Dr. Angelillo concluded that the Petitioner fell within the borderline range of intellectual functioning, had a dependent personality with passive-aggressive personality traits, and was suffering from psychological pathology. In reaching these conclusions, Dr. Angelillo reviewed the affidavit of complaint, the Petitioner's school records, his social and family history, his criminal background, his juvenile court records, and a memorandum of the investigator's interview with the Petitioner's mother. Dr. Angelillo administered tests and met with the Petitioner on five occasions for a total of five and one-half hours, during which they discussed, among other things, the different versions of the events that the Petitioner had provided to others, including his insistence of innocence. Dr. Angelillo produced a detailed report of his findings which did not include any recommendation of additional testing by other mental health professionals.

Throughout the Petitioner's brief, he maintains there were "red flags," such as his borderline I.Q., history of alcohol and drug abuse, and pattern of problems with impulse control, establishing that testing and evaluations by other mental health professional or addiction specialists were necessary. Dr. Angelillo, however, considered these factors in his evaluation and did not view these factors as "red flags" that necessitated additional testing and evaluations by other mental health professionals. Trial counsel was "not required to question a diagnosis put forth by a professional expert in the field" and cannot be faulted for relying upon an expert's assessment of the Petitioner. Christa Gail Pike v. State, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207, at *54 (Tenn. Crim. App., at Knoxville, Apr. 25, 2011), perm. app. denied (Tenn. Nov. 15, 2011). All of the facts and circumstances demonstrate that any funding for additional mental health professionals would have been sought in the mere "hope or suspicion" that favorable evidence could be obtained from an evaluation. Such "hope of suspicion" does not constitute particularized need.

Moreover, the post-conviction court found that had Dr. DeClue been called as a witness in the guilt phase of the trial, his testimony would not have raised any reasonable doubt in the minds of the jurors. The Petitioner asserts that the determination of the post-conviction court regarding Dr. DeClue's testimony "was one of admissibility only."

According to the Petitioner, once the post-conviction court served its "gatekeeping" function regarding Dr. DeClue's expert opinion, the court usurped the role of the jury in determining the weight of his testimony.

In post-conviction proceedings, the post-conviction court serves as the finder of fact. See T.C.A. § 40-30-105(b), -110, -111(b). The post-conviction court must assess the impact of evidence presented at the post-conviction hearing had it been presented at trial. See Strickland, 466 U.S. at 694-95. In making this assessment, the post-conviction court must resolve questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence. See Henley, 960 S.W.2d at 579. Accordingly, the post-conviction court was well within its authority in considering the weight and credibility of Dr. DeClue's testimony and finding that his testimony would not have raised reasonable doubt in the jurors' minds.

As noted by the post-conviction court, Dr. DeClue did not consider the prior testimony of the officers who questioned the Petitioner but relied upon the Petitioner's version of the interrogation and the method by which his written statement was taken that he relayed to the doctor years after the trial. Dr. DeClue did not question the Petitioner regarding any drug or alcohol abuse or whether he was intoxicated at the time that he gave his statements to the police. The post-conviction court noted that Dr. DeClue admitted difficulty in analyzing the case because the Petitioner's waiver of rights and initial statement to the police were not audio or video recorded. The Petitioner contends that the lack of a recording should be charged against the State. However, there is no state or federal constitutional right requiring the recording of interrogations. State v. Rollins, 188 S.W.3d 553, 564-65 (Tenn. 2006); State v. Godsey, 60 S.W.3d 759, 771 (Tenn. 2001).

The post-conviction court also found that the videotaped walkthrough of the crime scene, during which the Petitioner volunteered information without being asked, identified landmarks, disagreed with the officer, and appeared alert, contradicted Dr. DeClue's testimony about the coercive nature of the walkthrough. The evidence does not preponderate against the post-conviction court's extensive findings. The Petitioner is not entitled to relief with regard to this issue.

## B. Failure to Challenge the Forensic Pathologist's Testimony

The Petitioner asserts that trial counsel were ineffective in failing to challenge the testimony of the forensic pathologist at trial regarding injury to the victim's vaginal area. He further asserts that because trial counsel failed to challenge the forensic pathologist's testimony, the only explanation for the advanced decomposition of the victim's vaginal area that was presented at trial was that she had been raped by the Petitioner.

At trial, Dr. Cynthia Gardner with the Shelby County Medical Examiner's Office testified that she did not find any wounds to the victim's vaginal area and that due to decomposition, minimal soft tissue remained in the area. She did not find any sharp trauma on the bone in the area. Dr. Gardner said that because the decomposition in the vaginal area was separate from the decomposition in other areas, "that does indicate to me that there was probably some trauma there and, . . . it could be sharp trauma or it could be just bruising, severe bruising. The Petitioner faults trial counsel for failing to obtain an independent forensic pathologist, such as Dr. O.C. Smith, to rebut this testimony.

The post-conviction court rejected the Petitioner's claim finding that any deficiency did not result in prejudice. The Petitioner maintains that the post-conviction court's ruling "is yet another example of the post-conviction court substituting its own judgment for that of a properly qualified juror." He contends that the post-conviction court "is not empowered to choose between legitimate competing expert theories by excluding the lesser of the two." The post-conviction court, however, did not exclude the testimony of Dr. Smith based upon its admissibility. Rather, the court considered Dr. Smith's opinion and the weight to be afforded to it based upon other evidence presented at trial. The court found there was no reasonable probability that Dr. Smith's testimony would have affected the jury's finding of rape. These findings are within the purview of the post-conviction court.

The post-conviction court's findings are also supported by the record. Dr. Smith could not rule out trauma as testified by Dr. Gardner. Rather, he said he believed Dr. Gardner overstated the possibility of trauma and offered an alternative explanation for the differential decomposition of the victim's vaginal area. Furthermore, the victim was found in an advanced stage of decomposition with her underwear around her ankles. The Petitioner told police that the victim pulled down her underwear before her death because she likely believed she would be raped. When officers requested a DNA sample from the Petitioner, he admitted to having sex with her at his home. The Petitioner's stepfather, however, said the victim never left his sight while in the home. Based upon the evidence submitted at trial, including the Petitioner's admission to having sex with the victim, we cannot conclude that there was a reasonable probability that Dr. Smith's testimony would have altered the jury's finding of rape.

### C. Failure to Object to Jury Instructions

The Petitioner asserts that trial counsel were ineffective in failing to challenge jury instructions (1) defining "intentionally" with respect to the "nature of the conduct" or a "result of the conduct" and (2) providing that absolute certainty is not required to convict. As the State notes, the Petitioner did not raise these issues in his initial or amended post-conviction relief petitions, and the post-conviction court did not address the issues in its order

denying post-conviction relief. Therefore, these issues are waived. See T.C.A. § 40-30-106(g) (a ground for post-conviction relief is waived "if the Petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented").

## II. PENALTY PHASE

The Petitioner contends that trial counsel were ineffective with regard to the penalty phase of the trial in failing to (1) retain a neuropsychological expert to evaluate him; (2) present evidence of the Petitioner's character and background in mitigation; and (3) object to erroneous jury instructions.

The Tennessee Supreme Court has held that when challenging a death sentence in an ineffective assistance of counsel claim, the Petitioner must show that "'there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." Henley, 960 S.W.2d at 579-80 (quoting Strickland, 466 U.S. at 695); see Goad v. State, 938 S.W.2d 363, 371 (Tenn. 1996). The Petitioner contends this standard for prejudice is no longer applicable. According to the Petitioner, the United States Supreme Court in Wiggins v. Smith, 539 U.S. 510 (2003), set forth a new standard for prejudice in claims of ineffective assistance of counsel in capital proceedings requiring "a reasonable probability that at least one juror would have struck a different balance and voted for life had he or she heard the mitigating evidence that was not presented at trial." The Petitioner submits that the prejudice standard used by the post-conviction court conflicts with the standard set forth in Wiggins and that the post-conviction court's order should be reversed as a result.

The Petitioner in Wiggins alleged his trial counsel were ineffective in his capital sentencing hearing for failing to present mitigation evidence of his life history. Wiggins, 539 U.S. at 514. The United States Supreme Court concluded that trial counsel were deficient in their investigation into the Petitioner's background. Id. at 534. In examining prejudice, the Court held that "had the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." Id. at 536. The Court held later in the opinion that "[h]ad the jury been able to place Petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." Id. at 537. The Court cited a jury instruction in Maryland where the Petitioner was convicted that required the jury unanimously find that the aggravating factors outweigh the mitigating factors. Id.

The opinion in Wiggins includes no language expressly overruling the standard of prejudice in cases of ineffective assistance of counsel in capital sentencing hearings set forth

in <u>Strickland</u> and applied by Tennessee courts. Rather, the Court in <u>Wiggins</u> did apply the standard of "reasonable probability that [the jury] would have returned a different sentence" as set forth in <u>Strickland</u>. <u>See</u> <u>Wiggins</u>, 539 U.S. 536; <u>Strickland</u>, 466 U.S. at 695. Because Maryland required an unanimous verdict, if there is a reasonable probability one juror would have concluded that the aggravating circumstances did not outweigh the mitigating circumstances, there is also a reasonable probability that the jury would have returned a different sentence. Thus, when the Court in <u>Wiggins</u> also held that there was a reasonable probability that "at least one juror would have struck a different balance," the Court was not applying a new standard but was simply restating the same standard that it had applied earlier in its opinion in <u>Wiggins</u>, as well as in <u>Strickland</u>, in a different way. Moreover, the United States Supreme Court has recently reiterated the standard set forth in <u>Strickland</u>. <u>See</u> <u>Cullen v. Pinholster</u>, 131 S. Ct. 1388, 1408 (2011).

Accordingly, we reject the Petitioner's contention that the post-conviction court applied a wrong standard in determining prejudice with regard to his claims of ineffective assistance of counsel during the penalty phase of the trial. Rather, the post-conviction court correctly considered whatever the Petitioner had shown that "'there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." <u>Henley</u>, 960 S.W.2d at 579-80 (quoting <u>Strickland</u>, 466 U.S. at 695).

### A. Failure to Retain a Neuropsychological Expert

The Petitioner argues that "significant red flags" prompting neurological testing were present and that trial counsel were ineffective in failing to retain a neuropsychological expert to evaluate him. He asserts that had trial counsel retained a neurological expert, mitigating evidence of brain damage could have been presented and that a reasonable probability exists that the jury would not have imposed a sentence of death.

Counsel does not have a constitutional duty to present mitigation evidence at the penalty phase of a capital trial but does have a duty to investigate and prepare for both the guilt and penalty phases. <u>See</u> <u>Goad</u>, 938 S.W.2d at 369. Counsel does not have an absolute duty to investigate particular facts or a certain line of defense; however, counsel does have a duty to make a reasonable investigation or to make a reasonable decision that makes a particular investigation unnecessary. <u>Strickland</u>, 466 U.S. at 691. In determining whether counsel breached this duty, this Court reviews counsel's performance for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as viewed from counsel's prospective at that time. <u>Wiggins</u>, 539 U.S. at 523 (citations omitted).

-59-

Counsel is not required to investigate every conceivable line of mitigation evidence regardless of how unlikely the effort would be to assist the defendant at sentencing. Id. at 533. Likewise, counsel is not required to interview every conceivable witness. Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). This Court will not conclude that counsel's performance was deficient for failing to discover all mitigating evidence, if, after a reasonable investigation, counsel has not been put on notice that such evidence exists. See Babbitt v. Calderon, 151 F.3d 1170, 1174 (9th Cir. 1998) (citation omitted). In addition, the United States Supreme Court has held that

> no particular set of detail rules can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential.

Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (internal citations and quotations omitted).

We review the following factors in determining whether trial counsel were ineffective in failing to present mitigating evidence: (1) the nature and extent of the mitigating evidence that was available but not presented by trial counsel; (2) whether trial counsel presented substantially similar mitigation evidence to the jury in either the guilt or penalty phase of the proceedings; and (3) whether the evidence of applicable aggravating factors was so strong that mitigating evidence would not have affected the jury's determination. Goad, 938 S.W.2d at 371 (citations omitted).

As we have held above, the facts and circumstances did not establish particularized need for additional mental health experts, including a neuropsychologist. The Petitioner contends that trial counsel knew they needed a neuropsychologist but failed to retain one because they did not have sufficient time before trial to do so. The proof, however, does not support the Petitioner's contention. Trial counsel were not experts in the mental health field. While Lead Counsel identified a note that he had written in which he referred to a neuropsychologist, he said he was merely "brainstorming" and considering mental health professionals in different fields. This evidence does not demonstrate that Lead Counsel knew the services of a neuropsychologist were necessary. Furthermore, Dr. Angelillo did not recommend an evaluation by a neuropsychologist. Thus, even if trial counsel had additional time to seek mental health experts, trial counsel would not have been able to establish particularized need for such experts. The Petitioner has failed to present evidence sufficient to demonstrate deficient performance by trial counsel.

### B. Failure to Present Evidence of Character and Background

-60-

The Petitioner claims that trial counsel failed to present mitigation evidence of his character and background through expert and lay witnesses. The Petitioner faults trial counsel for failing to present experts such as Dr. Auble and Dr. Murray Smith to testify during the penalty phase. We have held that trial counsel were not ineffective in failing to retain a neuropsychological expert, such as Dr. Auble. Likewise, we have held that trial counsel would have been unable to establish particularized need for an addiction specialist, such as Dr. Smith, and that the trial counsel likely would have denied any request for funds to retain an addiction specialist.

Moreover, evidence of the Petitioner's history of drug and alcohol abuse was presented during the penalty phase through the testimony of Dr. Angelillo. As noted by the post-conviction court, Dr. Smith's testimony regarding the Petitioner's statements to the police were based upon the assumption that the Petitioner was under the influence of drugs and alcohol at the time and was sleep deprived. The post-conviction court found no credible independent proof to support the Petitioner's claims. Rather, Dr. Smith, as well as the mental health experts presented in the post-conviction hearing, relied upon the statements of the Petitioner made years after trial in reaching their conclusions.

The Petitioner maintains trial counsel were ineffective in failing to present mitigating evidence through lay witnesses. The Petitioner focuses upon the testimony of Andrew Folson, Joyce Rice, James Tools, and Don Legler. At the post-conviction hearing, trial counsel and Ms. Shettles testified at length regarding the reluctance of the Petitioner's relatives to testify on his behalf. Many of the Petitioner's family members were angry at him to implicating Mario Rice, his nephew, in the victim's murder. Despite these challenges, trial counsel were able to present mitigating evidence during the penalty phase of the trial that: (1) the Petitioner's sister, Pam, died of lupus in 1979 when the Petitioner was fourteen years old; (2) his father died of cancer in 1985 when the Petitioner was twenty years old; (3) his brother, Ricky, drowned in 1986 when the Petitioner was twenty-one years old; (4) his sister, Carolyn, died of colon cancer in 2001; (5) the Petitioner performed poorly in school, repeated the third and seventh grades, and left school in the eighth grade; (6) he witnessed a murder when he was sixteen years old and testified for the State resulting in the convictions of the two defendants; (7) he came from a close family; (8) his father argued with his mother daily, and they later separated; (9) his father slapped Pam on one occasion; (9) Pam was confined to a wheelchair; (10) the Petitioner had a low I.Q. that fell within the borderline range of intellectual functioning; (11) he was unable to maintain employment for a long period of time; (12) he had a history of alcohol and drug use, including marijuana and crack cocaine; (13) he experimented with LSD; (14) he reported auditory and visual hallucinations; (15) he had a prior suicide attempt; (16) he had no incidents of violence while in jail; and (17) his behavior was good while in a structured environment such as prison.

-61-

Ms. Shettles testified at the post-conviction hearing that the decision of the Petitioner's family members to cooperate was due to the passage of time. In determining whether trial counsel were ineffective in failing to present the testimony of these witnesses, every effort must be made "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006). The fact that Joyce Rice was more cooperative and forthcoming at the post-conviction hearing that during the penalty phase does not render trial counsel deficient.

With respect to Mr. Tools, the Petitioner's family informed Ms. Shettles prior to trial that Mr. Tools had little contact with the Petitioner, his mother, and his siblings. Based upon this information, trial counsel's actions in focusing their investigation elsewhere was reasonable. The post-conviction court also refused to accredit the testimony of Mr. Folson noting that he disagreed with post-conviction counsel during much of the direct examination, recalled little, and had to be prompted through leading questions. Mr. Folson admitted he stopped spending time with the Petitioner in the 1980's and was incarcerated at the time of the victim's murder. The evidence does not preponderate against the findings of the post-conviction court.

Even if trial counsel had performed deficiently, the deficiency did not result in prejudice. At trial, the State relied upon and the jury found three aggravating circumstances beyond a reasonable doubt: (1) the Petitioner had previously been convicted of a violent felony offense; (2) the murder was especially heinous, atrocious, or cruel; and (3) the murder was committed during the perpetration of a rape. See T.C.A. § 39-13-204(i)(2), (5), (7) (1997). On direct appeal, the Tennessee Supreme Court found that the reliance upon the prior violent felony aggravating circumstance was error but that the error was harmless beyond a reasonable doubt due to the strength of the evidence supporting the remaining two aggravating circumstances. Rice, 184 S.W.3d at 677-78. The Court described the evidence of the two remaining aggravating circumstances as "overwhelming." Id. at 678. We agree. The evidence presented at trial supporting these aggravating circumstances established that the thirteen-year-old victim was stabbed a total of sixteen times, including areas of her neck, head, and chest. She suffered defensive wounds and was left in the woods to die. Her shorts and underwear were around her ankles. The Petitioner admitted to having sexual intercourse with the victim. He maintained it was "consensual" and occurred earlier that day at his stepfather's house. The Petitioner's stepfather rebutted the claim that the Petitioner and the victim engaged in sexual activity in his home.

While the Petitioner asserts that evidence presented at the post-conviction hearing from various expert and lay witnesses was mitigating and that trial counsel's failure to present such evidence during the penalty phase was prejudicial, we disagree. The post-

conviction court described Dr. Auble's testimony as "tedious and impersonal." Dr. Angelillo had offered similar testimony at trial regarding the Petitioner's drug use, social history, and low I.Q. As found by the post-conviction court, Dr. Auble's testimony regarding the Petitioner's acts of violence against women would have had a negative impact in the penalty phase after the jury had just convicted the Petitioner of the violent murder of a thirteen-year-old girl. This evidence was not "clearly mitigating" as the jury could have concluded that the Petitioner was "simply beyond rehabilitation." See Cullen, 131 S.Ct. at 1410 (holding that evidence regarding serious substance abuse, mental illness, and criminal problems was not "clearly mitigating" because the jury might have concluded that the defendant was beyond rehabilitation); see also Atkins v. Virginia, 536 U.S. 304, 321 (2002) (noting that mitigating evidence can be a "two-edged sword" that juries might find to show future dangerousness).

While Dr. Auble concluded the Petitioner had cognitive disorder not otherwise specified and memory deficits, much of the information upon which Dr. Auble relied such as the Petitioner's social history, alcohol and drug abuse, background, low I.Q., and inability to maintain employment were presented to the jury through the testimony of Dr. Angelillo. Even though Dr. Auble administered additional tests to the Petitioner, we cannot conclude Dr. Auble's testimony would have affected the jury's determination due to the strong evidence supporting the applicable aggravating factors. See Goad, 938 S.W.2d at 371.

As noted by the post-conviction court, Dr. Murray Smith's testimony regarding the Petitioner's statements to the police were based upon the assumption that the Petitioner was under the influence of drugs and alcohol at the time and was sleep deprived. The post-conviction court found no credible independent proof to support the Petitioner's claims. Rather, Dr. Smith, as well as the mental health experts presented in the post-conviction hearing, relied upon the statements of the Petitioner made years after trial in reaching their conclusions.

The Petitioner's statements to Dr. Smith and other experts presented at the post-conviction hearing and Dr. Smith's resulting conclusions regarding the Petitioner's condition when he was interrogated by the police were not consistent with the evidence presented at trial. Contrary to the Petitioner's claims of sleep deprivation, Officer Clark testified at trial that the Petitioner had been sleeping prior to being questioned. The Petitioner was offered food, a drink, and the opportunity to use the restroom. Officer Clark said the Petitioner appeared coherent and alert and did not appear to be intoxicated. Sergeant Fitzpatrick also testified the Petitioner appeared to understand his questions, was responsive to those questions, and never indicated that he was under the influence of drugs or alcohol. Finally, the post-conviction court found that the video of the walkthrough of the crime scene demonstrated that the Petitioner was alert and cooperative, displayed no memory problems,

volunteered details without being asked, and gave responses that were not the result of suggestions by the officers. The evidence does not preponderate against the findings of the post-conviction court.

Moreover, the testimony of Joyce, Mr. Folson, Mr. Tools, and Mr. Leagler at the post-conviction hearing were largely cumulative to the evidence presented during the penalty phase of the trial. Accordingly, based upon the mitigating evidence presented and the strong evidence supporting the aggravating circumstances, the Petitioner has failed to show a "reasonable probability" or a "substantial" likelihood that the presentation of the additional evidence would have resulted in a different sentence. See Cullen, 131 S.Ct. at 1403 (defining "reasonable probability as a 'substantial,' not just 'conceivable,' likelihood of a different result").

### C. Failure to Object to Jury Instructions

The Petitioner contends trial counsel were ineffective in failing to object to a jury instruction that did not require a finding that the petitioner intended to inflict serious physical abuse in support of the heinous, atrocious, or cruel aggravating circumstance. The Petitioner did not raise the issue in his initial or amended post-conviction petitions, and the post-conviction court did not address the issue in its order denying relief. Accordingly, this issue is waived. See T.C.A. § 40-30-106(g).

### III. CUMULATIVE ERROR

The Petitioner asserts trial counsel's performance were constitutionally deficient based upon the cumulative effect of the errors. We conclude the Petitioner's counsel were not ineffective based upon any single alleged error or the cumulative effect thereof. The Petitioner is not entitled to relief on this issue.

### CONCLUSION

For the foregoing reasons, we affirm the judgment of the post-conviction court.

_____
CAMILLE R. McMULLEN, JUDGE